UNITED STATES, Appellee

v

JAMES R. HIGGINS, Yeoman First Class, U. S. Navy, Appellant

6 USCMA 308, 20 CMR 24

310

No. 6216

Decided September 2, 1955

*Fred W. Shields, Esq.*, argued the cause for Appellant, Accused. With him on the brief were *Clavin H. Childress, Esq.*, and *Commander Benjamin H. Berry*.

*Commander George Paul Kurtz* argued the cause for Appellee, United States.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

A general court-martial sitting at an overseas Naval station found that the accused had stolen $4,171.87 from the United States Government, and had falsified certain balances and public records—in violation respectively of Articles 121 and 134 of the Uniform Code of Military Justice, 50 USC §§ 715, 728. The sentence adjudged ran to dishonorable discharge, total forfeitures, five years' confinement at hard labor, and reduction in rating to seaman recruit— but the members of the court which tried the case attached a recommendation of clemency. The convening authority approved the findings, but reduced the period of confinement imposed to three years. In turn a board of review in the office of The Judge Advocate General, United States Navy, affirmed.

On the accused's petition, we granted review to consider assignments of error involving (1) the admissibility of certain statements made by the accused, (2) the instructions supplied by the law officer with respect thereto, and (3) the reception in evidence of a document abstracted from the purse of the accused's wife.

II

The operations of the office of the Naval Attache in Tripoli were administered by three Americans—a Commander Smith, the Naval Attache; the accused, Higgins; and the latter's wife, who was a Federal civilian employee. Commander Smith appears to have concerned himself primarily with intelligence work, and only slightly with the day-by-day functions of the office. Higgins served as "office manager" and, together with his many other duties, handled routine disbursements. And Mrs. Higgins performed secretarial

**311**

work chiefly, although her responsibilities appear to have expanded gradually because of a heavy office workload.

Certain delays and delinquencies in the submission of required reports dealing with financial matters during August of 1953 induced the dispatch to Tripoli of Lieutenant Commander Robert W. Maiden, an officer with considerable supply and disbursing experience. Maiden, who was permanently assigned to the office of the Naval Attaché in Rome, was directed to conduct an inspection of Commander Smith's office in Tripoli. He had scarcely begun his investigations when he discovered that the accused was in possession of some $100.00 which came from a confidential "C and Cl fund" retained by Commander Smith within a sealed envelope and a locked safe—to which repository, however, Higgins held the combination. Maiden initiated a discussion of this situation with the accused in the presence of Commander Smith—but Higgins requested that he be allowed to speak privately with Maiden in another room. Smith later testified that, during this first meeting, the accused had been warned that he "need not say anything that would be against your interests"—whereupon the latter replied that he was entirely willing to answer questions and "straighten the whole matter out."

Commander Maiden, however, was unsure that he had warned Higgins before the two had retired to an adjoining room. According to this officer's testimony, he had informed the accused, when they were alone together, that he considered the latter's possession of the money to be a very serious thing; that Higgins "didn't have to tell me anything more unless he wanted to"; and that "if he did tell me anything . . . I, in my capacity as inspecting officer, was duty bound to report it." When trial counsel sought to elicit from the witness the content of the accused's remarks during that interview, the defense objected strenuously on the ground that Article 31(b) of the Uniform Code, 50 USC § 602, had not been complied with.

As the accused's trial postdated the mentioned interview by some eight months, Commander Maiden was allowed to refresh his recollection by means of an examination of certain testimony he had given much earlier before a Board of Investigation. See Manual for Courts-Martial, United States, 1951, paragraph 146a. This action resulted in positive testimony to the effect that he had informed Higgins that the taking of the sum was a serious matter; that it appeared that it had been illegal; and that—while it would assist Maiden if the accused were to disclose what had been done with the money—the latter was not required to speak at all, but that "if he did tell me anything it would be used against him." Testifying in opposition to the reception in evidence of his oral statements to Maiden, the accused denied that the inspecting officer had informed him that he was under no duty to make a statement. The accused conceded, however, that Maiden had indicated that, as an auditing officer, it would be necessary that he report all matters communicated to him officially.

After noting that the point at issue had to do with the sufficiency of the warning, the law officer found that the accused had been safely advised—and permitted Maiden to testify to the accused's remarks made during their private conversation. At this same time, the law officer furnished the court-martial with an instruction the content of which forms the basis for an assignment of error—although it was not the subject of objection at the trial, either by the Naval lawyer or the civilian attorney, both of whom represented Higgins there.

The accused's explanation ran to the effect that he had done no more than use the sum in question to settle a bill for the purchase of cigarettes and other stores for Commander Smith and himself. His position was that there had simply been an overburden of work, and that all resultant delinquencies could be explained and remedied with ease. At this stage of his inquiry Commander Maiden appears to have had no real suspicion that funds in any substantial amount were missing; but the outlines of a darker picture began to appear as

he dug into the records of the office. Since Higgins had mentioned that he possessed documents which would account for certain apparent shortages, Maiden then—according to his testimony—informed the accused that, unless those papers were produced, it would appear that a very serious situation was present. However, he distinctly recalled commenting to Higgins that, although it would aid in the investigation to obtain this information from him, he was not required to produce it. And the inspector felt reasonably sure that once more he told the accused that anything he said could later be used against him.

Indeed, the inspecting officer stated that he had told Higgins "dozens or more times" that whatever comment he made could, if desired, be used against him. His caution in this particular arose from the circumstance that the accused seemed upset and repeatedly volunteered information—so much so that it seemed fair to Maiden to explain to Higgins again and again that he was under no slightest compulsion to report the matters revealed. One Taylor, who had accompanied the Commander to Tripoli, stated that some three or four days after their arrival he overheard the latter inform the accused that he was not required to say anything unless he chose to do so. Also, Commander Smith recited that on August 16th or 17th, a few days after Maiden had met Higgins, the accused had informed Smith that, although he did not mind rendering assistance in clearing matters up, he could not be expected to say or do anything which would tend to incriminate him. Apparently this conversation preceded the occasion on which Maiden claimed he had inquired of the accused about the production of documents relevant to the developing shortage, and had again warned him of his right to remain silent.

Higgins once more took the stand to deny Commander Smith's testimony, and also that Maiden had at any time informed him that no statement could be demanded of him. He also disclaimed all acquaintance with either the Uniform Code of Military Justice or the Manual for Courts-Martial prior to the arrival of Commander Maiden in Tripoli. Despite these protestations, the law officer admitted testimony establishing that the accused had ultimately confessed to having taken some $2,500 to $2,800 from the funds of his office, and had acknowledged that his purpose was to use the purloined money in gambling activities.

As to the charge of larceny, other items of evidence fit neatly into the pattern. For one thing, both documentary and testimonial evidence established that the accused gambled extensively, and believed he had devised a "system" which would yield large profits at the gaming table. Higgins' own deposit slips and other financial records showed that during March 1953 he had deposited sums aggregating from $3,700 to $4,500—a remarkable upsurge in affluence for one of his limited earning capacity. Furthermore, the accused, after admitting his peculations, had offered to make restitution—and Prosecution Exhibit 17 took the form of a list of his assets, prepared with his aid and executed for the purpose of indicating the sources from which restitution might be expected to flow. Also, the accused had assured a friend, one Hotaling, that anything stolen by him would be returned to the Government in full measure.

In evidence as Prosecution Exhibit 9 was a small unsigned typewritten card containing the following words:

"That money in the bank at Donora is going to be our new start. When there is $3,000.00 in in [it] we will go to Las Vegas. That is, after I get out of the pokey. Fill it up as soon as possible. However, if you would like to play for smaller stakes, and play longer, we can go much before that . . . $1,000 should be plenty if you are willing to play 400 games a night. We could both play two different tables, at 50¢ per game. When we reach $10,000 and not before, we will up the stakes to $1.00 per game."

By the accused's admission this document was handed by him to Mrs. Higgins. It was seized by Commander

**313**

Maiden during the course of a search of the Higgins' quarters, which were situated in a house rented by the Government from a private owner and furnished to the couple.

The search in question had been requested by the Naval Board of Investigation mentioned earlier, and thereupon was authorized by Commander Smith, who, as Naval Attache, occupied the position of the accused's commanding officer. By that time—September 3d—it was apparent that a substantial shortage existed, and that missing documents of relevance might well be found in Higgins' possession. The thoroughness of the quarters search is attested by Maiden's testimony that it had required "a better part of one day," including a minimum of from two to three hours spent in combing the master bedroom alone. During the search of the bedroom there rested on a dresser or night stand a purse which Mrs. Higgins had brought to the house when she, the accused, and the latter's assigned counsel accompanied Commander Maiden there to witness his activities. Having investigated the contents of two other handbags found in the house, Maiden proposed in addition to examine the purse in question—and it was there that he discovered the challenged typewritten card. His seizure of this document was complained of at the time by Mrs. Higgins and the Navy defense lawyer as being illegal and a violation of the privilege protecting marital communications.

Concerning the falsification of official documents charged against the accused, the Government's evidence clashed with his testimony that at pertinent times his wife, rather than he, possessed the responsibility for their preparation. The Government's case, however, received strong logical support from the circumstance that the papers in question pertained to the finances of the office of the Naval Attache, and that the inaccuracies therein were such as would have tended to conceal that office's substantial shortage of funds. No defense evidence was offered to controvert the Government's showing that the accused had in fact taken the missing money.

**314**

## III

As to the reception of the various statements made by the accused to the inspecting officer, we can ▮▮▮▮▮▮ ■ find no basis for overturning the ruling of the law officer. Admittedly Commander Maiden did not advise the accused of his right to remain silent in the specific language of Article 31(*b*) of the Code—a not unnatural omission, since the inspection did not open as a criminal investigation, and because Maiden was neither a lawyer nor a trained law enforcement agent. However, while a verbatim recital of the contents of Article 31 is desirable, a warning will not be held insufficient if it clearly conveys the purport of that Article. United States v O'Brien, 3 USCMA 325, 12 CMR 81. The Government's evidence here fully sustains a conclusion that an adequate warning was given Higgins within the meaning of this standard.

## IV

Reduced to its elements, the law officer's charge to the court made at the time of the reception of ▮▮▮▮▮▮ ■ testimony recounting the accused's initial admissions is as follows:

". . . [1] My ruling merely permits such statements to be placed in evidence; it does not conclusively establish the voluntary nature of the statements or the sufficiency of the warning. [2] You, in your deliberation upon the findings of guilt or innocence may come to your own conclusion as to the voluntary nature of the statements. [3] You may accept the statements as evidence only if you determine beyond a reasonable doubt that they were voluntary. [4] If you determine beyond a reasonable doubt that the statements were involuntary, you must reject and disregard them. [5] If you consider that the warning was not proper under Article 31, the same action is indicated. [6] You are also advised that any evidence adduced as to the voluntary or involuntary nature of the accused's out-of-court statements may be considered by you in determing [sic] the

weight that you will give to such statements."

The first of these six sentences is, at worst, ambiguous. As we observed in United States v Dykes, 5 USCMA 735, 19 CMR 31, the law officer's ruling that a statement was voluntarily made should not be relied on by court members as a predicate for a determination of the weight to accord to that statement. Instead, they are required to compute individually the extent to which testimony indicating that the statement was involuntary clouds its credibility. In evaluating this quality, they will often attach great weight to their own determination of whether the accused was warned as required by Article 31(b) of the Uniform Code—for the presence of such a warning is highly persuasive in an evaluation of voluntariness, and so in a conclusion that the statement is believable. On the other hand, court members are not authorized to reject a statement merely because of their belief that no statutory warning was furnished—unless they also decide, from this and other circumstances, that the statement is unreliable. United States v Dykes, supra. In a real sense, then, the law officer's ruling *does* "conclusively establish . . . sufficiency of the warning"—and the fact of voluntariness for that matter—insofar as *competency* is concerned. It does not, however, establish either for the purpose of assaying the *credibility* of the statement.

The law officer's second pronouncement is entirely correct. The burden of proof as to competency ▇▇▇▇ placed on the Government by the third sentence is subject to question—but we need not decide the point for, if error was committed in this respect, it was one distinctly favorable to the accused. The fourth part of the instruction challenged here is manifestly erroneous. It implies that, despite the law officer's reception in evidence of the accused's statements, the court *must* reject them, if its members conclude that they were involuntary—without, apparently, any sort of reference to credibility. In Dykes we pointed out that under the Uniform Code's allocation of functions to law officer and court members—to "judge" and "jury," as it were—the latter agency is permitted to pass on the weight of evidence only, and not on its competency. Accordingly, its members are not required to reject an item of evidence admitted by the law officer, unless they conclude that it does not merit belief. Since the law officer's advice here operated to impose another condition on their consideration of the accused's statements, it is erroneous. But this error likewise favored the defense.

The penultimate sentence of the law officer's charge reflects this identical mistake, in that it seeks to impose an unauthorized condition on the consideration of evidence by the trier of fact. United States v Dykes, supra. However, this too, redounded to Higgins' benefit. The final division of the charge presents, in substance, the true role of the members of the court with respect to a showing that a statement received in evidence was, in fact, made involuntarily. That role is simply to weigh the credibility of the evidence in the process of determining guilt or innocence.

When the instruction is examined *in toto,* it becomes apparent that the errors contained in it operate to a substantially greater extent to injure the Government than to harm the accused. Under these circumstances it can scarcely form the predicate for reversal. Still less is reversal in order since Higgins' able defense counsel did not at the time the advice was given request clarification of any of its ambiguities. United States v Moore, 4 USCMA 482, 16 CMR 56.

V

Prior to the findings, though, the defense did request that the law officer instruct court members in the following words with respect to the statements admitted in evidence, which prayer was denied:

". . . [1] The determination of the voluntary nature of an alleged confession is essentially a matter for the court and before any member can properly give any weight or credence to any alleged voluntary confession or admission of an accused, he must in-

**315**

dividually be satisfied that it was in fact voluntarily made and that the provision[s] of Article 31b of the Uniform Code were complied with; [2] the burden of establishing the voluntary nature of such a confession or admission is upon the prosecution and it is not for the defense to establish the involuntary nature of such an alleged confession or admission. [3] Further, the ruling of the law member on the question of admissibility is advisory only and is not controlling upon the court."

As we held in Dykes, the court *can* properly give weight or credence to a statement of the accused, ■ admitted in evidence by the law officer, when its members believe that the statement is true—although individually they may not be satisfied of its voluntariness. The competency of such evidence in the face of claims of involuntariness is consigned solely to the law officer for determination. Accordingly, the first portion of the requested instruction amounts to an incorrect statement of law.

While it is true that the burden of establishing voluntariness rests on the prosecution insofar as the ■ law officer's ruling as to admissibility is concerned, the only onus with respect to which the *court* need be advised—in the present problem—is the Government's burden of establishing the accused's guilt beyond a reasonable doubt. The members of the tribunal will evaluate the trustworthiness—jointly and severally —of the various items of evidence received through the law officer; but they are not permitted to redetermine the competency of any. Accordingly, the second portion of the instruction requested by defense counsel is wholly unresponsive to the role of the members of the court, once a confession has been received in evidence. Incidentally, one of the great advantages of the Dykes rule is that it avoids the necessity for such a direction—that is, the need for advice to the trier of fact concerning the competency of evidence, which advice would probably do little more than confuse its recipient, and create a basis for hyper-technical reversals.

**316**

The terminal sentence of the instruction is subject to the very criticism advanced by the law officer ■ during the course of an out-of-court hearing—namely, that his ruling "is final on the interlocutory question on the admissibility of the statement." Indeed, it is far more than "advisory" as to admissibility—and is "controlling" on the court as to competency. On the other hand, the law officer's ruling as to admissibility should be deemed *much less* than "advisory" so far as the *trustworthiness* of an accused's statement is concerned. While that ruling necessarily requires the formation of an opinion by the law officer with respect to voluntariness, as well as adherence to the provisions of Article 31(*b*), court members may—indeed should—disregard that opinion entirely in attempting to decide what weight, if any, should be accorded a statement admitted in evidence. Since the third portion of the requested instruction was wholly in error in its delineation of the court's role, its denial also constitutes a frail reed on which to sustain arguments for reversal.

Speaking candidly, we perceive very little in the record which suggests that the accused's statements were other than completely voluntary. Cf. United States v Davis, 2 USCMA 505, 10 CMR 3. The Government's witnesses reported the recitation of repeated warnings to him of his privilege to remain silent—but nonetheless he freely supplied information regarding the missing funds. Higgins' own testimony affords but the slightest intimation of the presence of any type of influence or inducement which might serve to create "any reasonable likelihood that it would so constrict the will of petitioner that he might have been induced to confess guilt of a serious crime which he did not commit." See United States v Colbert, 2 USCMA 3, 6 CMR 3.

At all events, the instructions of the law officer, we are sure, furnished the members of the court with a proper framework within which to evaluate the voluntariness of the confessions. In this connection, we observe that—in addition to the law officer's previously

quoted advice—he told the court shortly before it began its deliberations that:

"The court is reminded of the previous ruling of the law officer which permitted certain admissions and confessions of the accused to be placed in evidence. This ruling was final only on the question of the admissibility of the confessions, and admissions, and did not conclusively establish the voluntary nature of the confession or the sufficiency of the warning. You in your own deliberations upon the guilt or innocence of the accused may come to your own conclusions as to the voluntary nature of the confessions and the sufficiency of the warning."

Read fairly, the instructions supplied at the trial "informed the court that each member might determine the issue of voluntariness for himself." United States v Davis, supra. Error in these directions, we believe, lay only in the authorization for a redetermination of issues of competency and an exclusion of evidence which the law officer had admitted, without regard to its trustworthiness. However, since this error gave the defense more—not less—than it was entitled to receive, it must be clear that it will not avail Higgins in this Court.

### VI

The law officer appeared to think that the defense contention that prosecution Exhibit 9 was inadmissible ■■■■■■ ■ as a privileged communication was disposed of by the plain wording of the current Manual for Courts-Martial:

"The purpose of the privilege extended to communications between husband and wife, client and attorney, and penitent and clergyman, which grows out of a recognition of the public advantage that accrues from encouraging free communication in such circumstances, is not disregarded by allowing or requiring an outside party who overhears or sees such a privileged communication, whether by accident or design, to testify concerning it, nor is the purpose of the privilege disregarded by

the reception in evidence of a writing containing such a communication which was obtained by an outside party either by accident or design." [Paragraph 151b(2).]

We, too, believe that the rule announced in this legal source is dispositive here. See also Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 239.

Civilian authorities appear to support the position taken by the Manual's draftsmen. Dean Wigmore writes, for example:

"For *documents* of communication coming into the *possession of a third person,* a distinction should obtain, analogous to that already indicated for a client's communications (*ante,* §§ 2325, 2326); *i.e.* if they were obtained from the addressee-spouse by voluntary delivery, they should still be privileged (for otherwise the privilege could by collusion be practically nullified for written communications); but if they were obtained surreptitiously or otherwise without the addressee's consent, the privilege should cease." [Wigmore, Evidence, 3d ed, § 2339(3), page 655.]

And Wharton notes that, "Where a letter of one spouse falls into the hands of a third person, it is said that the 'sacred shield of privilege' is removed, since one who makes a communication to another in writing is deemed to have understood that it might be preserved and used against him." Wharton, Criminal Evidence, 11th ed, § 1256.

A pertinent annotation comments as well that:

" . . . Cases in which the written communication gets into the hands of a third person without the connivance of the addressee of the communication, but by accident, or by the design of the person securing the letter, are analogous to cases of oral communication in which a third person accidentally or designedly overhears a conversation between husband and wife, and the letters should be admitted in evidence for the same reason that the testimony of a third person is so admitted; that

**317**

is, the testimony is not that of the spouse, and not within the import of the rule. But where the letter is sought to be introduced in evidence by a third person through the connivance of the spouse to whom it was addressed, the situation is analogous to that in which the testimony of one of the spouses is sought to be introduced regarding an oral communication, and it should not be admitted unless it is further shown that a third person has been allowed to see the communication by the writer—a circumstance which would deprive it of any confidential characteristics.

"And the cases, on the whole, having regard to their facts, rather than to the rules therein announced, would seem to support the above proposition, although some of them would still remain irreconcilable under any theory." [63 ALR 107, 120.]

Of course, had there been evidence that Mrs. Higgins had connived at the Government's acquisition of the card which later became Prosecution Exhibit 9, we would have no doubt that it would fall within the privilege protecting interspousal communications. Cf. United States v Marrelli, 4 USCMA 276, 282, 15 CMR 276. However, the converse situation unquestionably obtained here for—far from conspiring with the investigators—Mrs. Higgins did her utmost in protesting the seizure of the document.

The legality of the search and seizure by which Prosecution Exhibit 9 was obtained gives us greater pause. Since Commander Smith, the accused's commanding officer, had specifically authorized the search of the Government quarters occupied by the accused and his wife, there can be no question that the effort enjoyed a proper inception. See Manual for Courts-Martial, United States, 1951, paragraph 152; United States v DeLeo, 5 USCMA 148, 17 CMR 148. The law officer concluded that the examination of Mrs. Higgins' purse constituted a permissible part of the search of the house; and—since she had left it for at least two hours on an open night stand in the master bedroom—we

are inclined to agree that it should be considered as belonging in the same category as other personal effects present in the house, and so clearly a proper object of search.

In this connection, we are cognizant, too, that if an interested party accompanies investigators who are conducting a search—especially one in quest of small objects or, as here, of missing documents—there is always a risk that he will attempt to conceal property on his person, or to destroy it to avoid discovery. There would be even greater risk if the party were permitted to carry with him a handbag or other container immune from search. Thus, at least something is to be said for the reasonableness of Commander Maiden's action in examining the purse, although it be considered that it had not been assimilated into the quarters through having been deposited there for several hours during the course of the exploration.

If we were to assume that the sifting of the purse equates in legal effect to a search of Mrs. Higgins' person, then the action may well have been illegal as to her. However, since the right against illegal search and seizure is a personal one, would that circumstance avail the present accused, her husband? Cf. United States v Dupree, 1 USCMA 665, 5 CMR 93; Goldstein v United States, 316 US 114, 86 L ed 1312, 62 S Ct 1000. To be sure, the wife's person might conceivably be analogized to an extension of the accused's own person and property—an analogy supported by the ancient, but discredited, maxim to the effect that husband and wife constitute but one legal identity. Yet, if this proposition is to be accepted, then the Government may argue persuasively that the search of Mrs. Higgins' purse fell within the ambit of the original authority—for the accessory in question must be treated as the equivalent of any chattel owned directly by the accused and found in his quarters.

Abandoning such subtleties, we observe that the typewritten card does not readily reveal itself as the *instrument* of an offense of any nature. See, e.g., United States v DeLeo, supra;

318

United States v Marrelli, supra; United States v Rhodes, 3 USCMA 73, 11 CMR 73; United States v Doyle, 1 USCMA 545, 4 CMR 137. As mere *evidence* of crime—without more—it is probable that Prosecution Exhibit 9 could not have been the subject of lawful seizure by Commander Maiden.

Once more, though, we encounter the issue of the accused's standing to complain of the seizure—one which finds no ready resolution in the Federal cases. See, e.g., United States v Jeffers, 342 US 48, 96 L ed 59, 72 S Ct 93; McDonald v United States, 335 US 451, 93 L ed 153, 69 S Ct 191; Annotation, 96 L ed 66. The mere fact of marital relationship does not appear to grant to one spouse standing to complain of the use against him of property illegally seized from the other. Cf. United States v Hoyt, 53 F2d 881, 884 (SD NY); Nelson v United States, 18 F2d 522 (CA 8th Cir). Clearly, too, the accused was not the owner of the typewritten card for, as defense counsel contended strenuously at the trial, it constituted a *communication* from him to his wife. While the concept of privilege may be said to surround a written interspousal communication, once received by the addressee, it seems highly dubious that the sender yet retains a proprietary interest therein of such a nature as to enable him to complain of a seizure of the communication's vehicle. Cf. Goldman v United States, 316 US 129, 86 L ed 1322, 62 S Ct 993. Assuming, therefore, that Commander Maiden acted unlawfully in seizing the card constituting Prosecution Exhibit 9, we must record our doubts that this illegality should redound to the accused's benefit by permitting to him the suppression of the Exhibit.

### VII

Fortunately we need supply no definitive answer to this perplexing problem —for we agree with the board of review that the reception of this document at the trial could not possibly have prejudiced the accused. Reasonable minds may differ regarding the extent, if any, to which the typewritten card tended to incriminate the accused; certainly, standing alone, it proves little. In any event, whatever import it may have possessed vanished promptly in the veritable tidal wave of evidence establishing the accused's guilt of larceny. A large and unexplained shortage in accounts over which he maintained supervision, numerous irregularities in his handling of pertinent records, extraordinarily large deposits of money in his personal banking account, extensive gambling activities, and various confessions and admissions of responsibility—these all add up to the most compelling evidence of guilt, which, be it noted, was at no time controverted by the defense. Clearly, then, the findings rendered under Article 121 must be affirmed. Cf. United States v Haimson, 5 USCMA 208, 17 CMR 208.

Prosecution Exhibit 9 may be said to bear on the accused's guilt of falsifying documents only in that it tends to show in some degree a substantial larceny, which would serve to provide a motive for the former misconduct. But, as we have just emphasized, this larceny was amply and overwhelmingly established by other evidence. Therefore, we fail to perceive that error—if error there is—in receiving the Exhibit could prejudice the accused with respect to the findings under Article 134. Cf. United States v Adamiak, 4 USCMA 412, 15 CMR 412.

### VIII

It follows then that the findings and sentence, as acted on by the board of review, must be, and are hereby, affirmed.

Chief Judge QUINN and Judge LATIMER concur.