UNITED STATES, Appellant

v

WOODFORD S. SEIBER, Captain, U. S. Army, Appellee

12 USCMA 520, 31 CMR 106

No. 15,037

November 17, 1961

*First Lieutenant Jerome Nelson* argued the cause for Appellant, United States. With him on the brief was *Lieutenant Colonel James G. Mc-Conaughy.*

*Colonel W. H. Blackmarr* argued the cause for Appellee, Accused. With him on the brief were *Lieutenant Colonel Ralph W. Wofford* and *First Lieutenant Burnett H. Radosh.*

## Opinion of the Court

KILDAY, Judge:

Certain statements and documents submitted by this accused to the Department of the Army in the course of his application for a commission as a Regular Army officer were false. As a consequence, he was tried by general court-martial and convicted of several offenses in violation of the Uniform Code of Military Justice. The convening authority approved the findings and accused's adjudged sentence to dismissal and total forfeitures. The board of review, however, set aside the findings and sentence, and ordered all charges and specifications dismissed. Thereafter, pursuant to Article 67(b) (2) of the Uniform Code, 10 USC § 867, the Acting The Judge Advocate General of the Army certified the case to this Court, requesting us to resolve the following issue:

"WAS THE BOARD OF REVIEW CORRECT IN HOLDING THAT THE LAW OFFICER ERRED IN DENYING THE MOTION TO SUPPRESS EVIDENCE OBTAINED THROUGH DISCLOSURES MADE TO THE

520

Accused's apparently stormy marriage was terminated by divorce on the first day of February 1960. Two days later, his ex-wife came to the post where accused was stationed, to see the staff judge advocate of the command. She was upset even to the point of hysteria over the fact that her marriage had ended, and was obviously quite bitter. During the interview she told him she wished to relate how her ex-husband had obtained his commission by fraud. Upon hearing that accusation, the staff judge advocate interrupted and permitted her to relate no details. He told her such a matter was properly for the consideration of criminal investigators and, when she indicated willingness to talk to them, had her referred to an individual with those duties. As a result of the disclosures made by the accused's ex-wife to that agent, the fraudulent documents and the evidence establishing their falsity were developed. Thereafter, faced with the evidence amassed by the Government, accused, in an extrajudicial statement, admitted submitting the false documents and statements to secure his Regular Army commission.

At trial, the defense made timely objections to the admissibility of the incriminating documents on the basis that when accused's ex-wife disclosed information to the authorities concerning his wrongdoings, she was revealing privileged confidential marital communications. She did not testify at trial, and no alleged confidential communication itself ever came before the triers of fact. The defense argued, however, that the incriminating evidence was uncovered by the Government only because of the breach of confidence by the ex-wife and, having resulted from such improper disclosure, it was tainted and rendered inadmissible. The law officer overruled those objections, but the board of review held he erred.

Acknowledging that there was no specific evidence that the information disclosed had been received by his spouse during the marital relationship and as a confidential communication from accused, the. board nonetheless drew those inferences. Thus, it concluded, the ex-wife's testimony would not be admissible at trial over the defense assertion of privilege. See paragraph 151b(2), Manual for Courts-Martial, United States, 1951; Pereira v United States, 347 US 1, 98 L ed 435, 74 S Ct 358 (1954). Nor could evidence of the alleged privileged communication be admitted through an outside party where, as in the case at bar, that party acquired his information through connivance or voluntary disclosure by the spouse to whom the communication had been addressed. See United States v Higgins, 6 USCMA 308, 20 CMR 24, and authorities therein collated.

As previously mentioned, no such evidence was introduced by the Government. Rather, its case was built largely upon official Department of the Army records concerning accused's commission, and independent proof of the falsity of the statements and supporting documents he submitted in his application. And, as the board of review correctly pointed out, such evidence could have been obtained by the prosecution wholly without regard to any disclosures by the wife. Nonetheless, because accused's fraud had remained undiscovered for over a year until she apprised the authorities thereof, the board found the otherwise clearly admissible evidence to be the fruit of her poisoned declarations. Accordingly, it held such evidence to be equally within the privilege, just as would the ex-wife's testimony, and hence that the law officer erred in refusing to bar its admission at trial. Further, since accused could not be prosecuted without resort to such tainted evidence, the counts against him were ordered dismissed.

We cannot agree, and are therefore constrained to answer the certified question in the negative. As the board of review conceded, there is no direct evidence that whatever disclosure accused's ex-wife made constituted a breach of any confidence communicated to her by him during the marital tenure. While this fact casts substantial

doubt on the validity of the board's initial premise, we need not concern ourselves with the matter, for we prefer to ground our action on a more fundamental inquiry.

Admitting it could uncover no precedent to support its application of the poison tree doctrine in the case at bar, the board of review sought support from our decision in United States v Higgins, supra. There a document had been seized from the accused's wife over her protest. For that reason we held the privilege nonapplicable, although we observed that:

".  .  .  had there been evidence that Mrs. Higgins had connived at the Government's acquisition of the .  .  . [document], we would have no doubt that it would fall within the privilege protecting interspousal communications." [6 USCMA at page 318.]

However, that observation provides scant support for the position taken by the board of review, for it must be borne in mind that the document involved in Higgins' case *was itself a communication* from him to his spouse, in writing. Thus, our comment indicates nothing more than recognition of the rule that the privilege attaching to marital confidences may still be asserted against introduction of the *communication* and is not nullified where the addressee-spouse voluntarily makes a disclosure or delivery of the communication. Patently, that is not the case in the present instance. Although the wife may indeed voluntarily have "put the hounds on the scent," none of the evidence introduced by the Government was obtained from her and, admittedly, none constitutes either a verbal or written marital communication. Hence, the question is simply whether accused is to be forever insulated from prosecution for offenses proved wholly by independent evidence, merely because the Government was first put on notice of his acts by his ex-wife.

We conclude not. As the board of review pointed out, the husband-wife privilege originally developed as a *testimonial* privilege. In that connection we find the decision in United

States v Winfree, 170 F Supp 659 (ED Pa) (1959), enlightening. There a similar question was presented. In a prosecution for income tax evasion, it appeared that Internal Revenue agents had interrogated the taxpayer's wife, and the husband moved to suppress all evidence obtained by the agents, directly or indirectly, as a result of those interviews. The court noted that the wife's testimony and evidence of any extrajudicial statements made by her to the agents could be barred at trial, but denied the motion, stating:

".  .  .  the information was not secured from Mrs. Winfree in any judicial proceeding or trial, much less a trial where life or liberty was at stake. The information was given voluntarily in an extra-judicial investigation, without the violation of any provision of the laws or Constitution of the United States.  .  .  . The defendant's counsel, in his able brief, has not pointed to any federal case holding that judicial supervision of the administration of criminal justice in the federal courts requires federal agents to refrain from securing, in the extra-judicial investigation of federal crimes, information of this type from a witness who is incompetent to testify at a trial where their procedure is not a violation of federal rules for the guidance of conduct.  .  .  .

"This record discloses no disregard of fair procedure imposed by law."

In similar vein is the decision in United States v Ashby, 245 F2d 684 (CA 5th Cir) (1957). There, during the pendency of a divorce suit, a wife had, out of anger and desire to injure, turned over to an agent of the Internal Revenue Service her husband's business records, without his knowledge or consent. Subsequent to the divorce, the husband was indicted for failure to make income tax returns. Upon his motion, based *inter alia* on the marital relationship, the District Court ordered the evidence obtained from the wife suppressed and the indictment dismissed. The Court of Appeals reversed, noting that no testimony by the wife

against her husband was involved, and that the records were in no sense a communication between the two nor confidential between them.

We, too, believe the marital privilege has no applicability to extrajudicial occurrences, where the spouse does not herself testify and no privileged communication is introduced into evidence. We are not unmindful "of the public advantage that accrues from encouraging free communication" between spouses, which the Manual regards as the purpose for extending the privilege to such confidences. Manual, supra, paragraph 151b(2). Like the board of review, we believe the rule insulating such privileged communications should be jealously guarded. Yet, at the same time, before giving our imprimatur to an exclusionary rule which extends the marital privilege to non-testimonial evidence, we must weigh other considerations in the balance. As the Supreme Court stated in Nardone v United States, 308 US 338, 340, 84 L ed 307, 60 S Ct 266 (1939):

"Any claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Constitution or the law of the land."

Or, as that Court more recently put it: ". . . any apparent limitation upon the process of discovering truth in a federal trial ought to be imposed only upon the basis of considerations which outweigh the general need for untrammeled disclosure of competent and relevant evidence in a court of justice." [Elkins v United States, 364 US 206, 216, 4 L ed 2d 1669, 80 S Ct 1437 (1960).]

When we heed those injunctions, we must decline the invitation to apply the poison tree doctrine to marital confidences. It is quite true, as appellate defense counsel point out, that the Supreme Court stated in Silverthorne Lumber Co. v United States, 251 US 385, 392, 64 L ed 319, 40 S Ct 182 (1920), where the poison tree doctrine had its genesis:

". . . The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all."

However, it is important to note that the decision in Silverthorne also carefully differentiated a situation involving improper action by an individual, stating "the case is not that of knowledge acquired through the wrongful act of a stranger" (251 US at page 391), and that "knowledge gained by the government's own wrong cannot be used by it in the way proposed" (251 US at page 392). Moreover, that same thread runs throughout the cases where primary and derivative evidence has been excluded. The point may be simply illustrated by adverting to the cases cited by Judge Ferguson in his opinion in United States v Haynes, 9 USCMA 792, 27 CMR 60, where he stated that to allow use of the questioned evidence "would in effect be permitting the Government to do indirectly what it is forbidden . . . to do directly."

Manifestly, a distinction based upon misconduct by agents of the Government or under color of some authority is sound. It has long been settled that evidence taken by wrongful act of a private person, without participation by the Government, will not be barred from evidence. Burdeau v McDowell, 256 US 465, 65 L ed 1048, 41 S Ct 574 (1921); see also United States v Ashby, supra. Nor has that rule been sapped of any vitality by the recent decisions of the Supreme Court in Elkins v United States, supra; and Mapp v Ohio, 367 US 643, 6 L ed 2d 1081, 81 S Ct 1684 (1961). In Elkins, where the so-called silver platter doctrine was overturned, the evidence was wrongfully obtained, not by an individual, but by state officers who were treated just as if they had been Federal agents. Likewise, the facts in Mapp—which overturned Wolf v Colorado, 338 US 25, 93 L ed 1782, 69 S Ct 1359 (1949)—involved lawless acts by state officers. Further, perusal of those and prior decisions demonstrates beyond peradventure that the rule of exclusion applied to both

primary and derivative evidence was calculated to deter wrongful activity by the Government, and to keep the judiciary, as an arm of the Government, from becoming accomplices to such impropriety.

In the case at bar, there has been no misconduct by the agents of any sovereign. The Government is guilty of no impropriety and hence there is no wrongful activity on its part to deter. Nor, obviously, does allowing the independently obtained evidence to come before the court-martial cause the court to become an accomplice to any wrongdoing by the Government. Thus, there is absent in this instance the compelling considerations which would support application of the exclusionary rule. Under those circumstances, there is no reason to exclude the "derivative" and otherwise admissible evidence used by the prosecution against accused, merely because his ex-wife apprised criminal investigators of his fraud, which resulted in their obtaining the incriminating evidence independently from other sources.

In the present instance, the accused's ex-spouse did not testify against him. Neither was any privileged communication of any kind introduced in evidence. Nor was there any improper activity or misconduct on the part of any agents at any level of Government in any regard. And, it is clear the evidence used by the prosecution was lawfully secured from Department of the Army records and independent sources. Accordingly, we hold the law officer did not err in admitting the evidence in question.

The decision of the board of review is reversed, and the case is remanded to The Judge Advocate General of the Army for action not inconsistent with this opinion.

Chief Judge QUINN and Judge FERGUSON concur.