UNITED STATES, Appellee

v

VERNON A. SOUDER, Fireman, U. S. Navy, Appellant

11 USCMA 59, 28 CMR 283

No. 13,165

Decided December 11, 1959

*Lieutenant Colonel E. W. Johnson,* USMC, argued the cause for Appellant, Accused.

*Major Ted H. Collins,* USMC, argued the cause for Appellee, United States. With him on the brief was *Commander Craig McKee,* USN.

## Opinion of the Court

HOMER FERGUSON, Judge:

Tried by special court-martial, the accused was found guilty of larceny of two accordions, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921, and sentenced to bad-conduct discharge, partial forfeitures, reduction in grade, and confinement at hard labor for six months. With some reduction in sentence, intermediate appellate authorities affirmed, and we granted review on the issue of whether accused was prejudiced by receipt in evidence of incriminating statements made by him to a Lieutenant (jg) Gallagher.

Two accordions were stolen from an automobile belonging to a person in the naval service. He duly reported his loss to naval security personnel, and they in turn advised local music stores to be on the lookout for the instruments. The accused, accompanied by a fellow sailor, entered a music store in the area, owned and operated by Lieutenant (jg) Gallagher. In their possession was one of the stolen accordions. Lieutenant Gallagher, at all times pertinent hereto a naval officer on active duty, noted that the accordion fitted the description of one of the stolen instruments given him by security personnel. The accused and his companion offered to sell the instrument. Lieutenant Gallagher proceeded to haggle over the price and "bid very low on it, so that they would be thinking about the price rather than the possibility of suspecting anything was at fault or that I might be an officer or that I might be going to call the police or something like that." Gallagher obtained from the accused and his friend an admission

that they owned the accordion and had obtained it "a certain way aboard ship." He subsequently sought to have both men sign a bill of sale and, after accused's companion affixed his signature to the document, identified himself as a naval officer and took them into custody. Gallagher's purpose in interrogating the suspects is made crystal clear by the following declarations in his testimony:

"Q. Did you tell these two men that it wasn't worth $15.00 and would probably take about $60.00 to repair?
"A. Yes, I did. The reason for that was I have never been on the apprehension end of any military offense, have been legal officer and counsel on cases and I must admit, I was a bit nervous. So I planned it so these men would have something to think about and I could keep talking and give them more to think about so I wouldn't give myself away. I wanted them to think about the accordian [sic] and the haggling and the price and not anything I might do to give away my status.

. . . . .

"Q. You don't know which one did the talking?
"A. No. While I was interviewing them I naturally being aware of the situation, I questioned them very closely as to who this instrument belonged to and made them explain how it happened it belonged to both of them and not just one, and they said 'well, we, just got it aboard the ship a certain way and it belongs to both of us.' and in doing so I wanted to make sure either one or the other or both of them would be committed on

the actual possession of the instrument.

"Q. How did they come about then, that Poston had signed the slip, and not the accused?

"A. After identifying myself and asking them for their I.D. Cards, Poston was standing next to me and I realized later that it was my error by not getting both of them to sign. I am certain, reasonably certain at the time, that if I had asked this man for his signature he would have given it to me."

Code, supra, Article 31(b), 10 USC § 831, provides pertinently:

"(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."

Whether viewed from the standpoint of the accused or that of his interrogator, it is obvious that Lieutenant Gallagher was under a duty to advise both sailors of their rights under Code, supra, Article 31, prior to questioning them concerning the stolen musical instrument. He was a "person subject to this chapter" interrogating an individual whom he "suspected of an offense." In fact, it is patent from his testimony, quoted supra, that Lieutenant Gallagher conversed with the accused and his companion for the express purpose of obtaining incriminating admissions from them. His only apparent regret was his failure to obtain the accused's signature on the bill of sale for the accordion. Regardless of the *quantum* of the other evidence in the case, reversal must follow. United States v Williams, 10 USCMA 578, 28 CMR 144.

The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate General of the Navy. A rehearing may be ordered.

QUINN, Chief Judge (concurring):

The mere fact that Lieutenant Gallagher is a person subject to the Uniform Code of Military Justice is not, as the principal opinion implies, the whole of the matter in determining whether there has been a violation of Article 31. There are some situations to which Article 31 does not apply, even though the participants are persons subject to the Uniform Code. United States v Gibson, 3 USCMA 746, 14 CMR 164; United States v Dandaneau, 5 USCMA 462, 18 CMR 86. The record of trial in this case shows that Lieutenant Gallagher suspected the accused of a specific offense and interrogated them for the sole purpose of obtaining incriminating admissions. In my opinion, his action falls within the purview of Article 31 and made the accused's statement inadmissible in evidence because obtained in violation of the Article. I, therefore, concur in setting aside the decision of the board of review.

LATIMER, Judge (concurring in the result):

I concur in the result.

It appears to me that Judge Ferguson's opinion oversimplifies the problem. While it must be conceded that the naval officer and the accused were both subject to the Code, we have on numerous occasions insisted that that alone is not sufficient to bring conversations within the coverage of Article 31, Uniform Code of Military Justice, 10 USC § 831. As early as United States v Wilson, 2 USCMA 248, 8 CMR 48, I pointed out that unless the language of Article 31 was limited by judicial interpretation, it would encompass situations not intended by Congress. It requires little judicial acumen to determine that, if the language of that Article is always construed in favor of an accused, it will bring about absurd results, and a statute should not be interpreted to accomplish that purpose. Within the past few days, in United States v Morris, No. 13,519, petition for grant of review denied, November 19, 1959, we were faced with a situation where a literal application of the Article would have prevented an

Army nurse, who had been stabbed in the back by a soldier, from testifying that he threatened to kill her because the threat was prefaced by a question as to what he was doing. Admittedly, the Article is worded broadly, but a common-sense interpretation and one within the language used suggests that the record must show certain conditions to exist before the advice required by the Article need be given. In United States v Wilson, supra, I set forth my conclusion in that regard in the following language:

". . . Accordingly, I believe before the advice required by the Article need be given, three conditions should be fulfilled: first, the party asking the question should occupy some official position in connection with law enforcement or crime detection; second, that the inquiry be in furtherance of some official investigation; and third, the facts be developed far enough that the party conducting the investigation has reasonable grounds to suspect the person interrogated has committed an offense."

One of these conditions was made the basis for our holding in United States v Grisham, 4 USCMA 694, 16 CMR 268, for there a unanimous Court held:

"Properly read, we are sure, paragraph 140a of the Manual and its quoted explanatory material do no more than make plain that which is implicit in the Article itself. The 'official investigation' referred to in paragraph 140a must be taken to mean not only an *official* inquiry, but as well an official *military* investigation. Thus, as we have seen, if persons not subject to the Code—such as civilian law enforcement authorities —conduct an interrogation or request a statement in furtherance of any military investigation, or in any sense as an instrument of the military, then the duty arises to furnish sound advice concerning the provisions of Article 31. Otherwise they are not required to do so—and their failure will not operate to deprive the court-martial of any statement they may secure."

In United States v Dandaneau, 5 USCMA 462, 18 CMR 86, the Court reaffirmed the rule that officiality was one of the touchstones for determining the necessity of warning. There we stated:

"Not every inculpatory statement made by an accused in conversation with another is inadmissible because of a failure to warn him of his rights under Article 31. The prohibition of the Article extends only to statements elicited in the course of official interrogation. United States v Gibson, 3 USCMA 746, 14 CMR 164. It is essential, therefore, to determine whether the question asked by Captain Lucas, when he first met the accused in the squadron office, is, as a matter of law, so clearly official or so demanding of an answer by virtue of his superior rank as to fall within the interdiction of the Uniform Code."

In United States v Johnson, 5 USCMA 795, 19 CMR 91, another of the conditions was considered, namely, whether the interrogator must occupy some official position in connection with crime enforcement or detection. We concluded they must, for we held a person subject to the Code, who in that instance was the victim, need not warn a person suspected of an offense. In that case we had this to say:

". . . Nevertheless, appellate defense counsel argue that the victim was under a duty at this initial discussion to warn the accused of his rights under Article 31 and his failure in that regard not only rendered the statements incompetent but, in addition, it caused all subsequent proceedings to be inadmissible. We hold otherwise on that contention because the victim here acted only in a personal, and not in an official, capacity. United States v Gibson, 3 USCMA 746, 14 CMR 164. In reaching that conclusion, we are not unmindful of the fact that it was the criminal investigator who notified the battery commander of the polygraph examination results, and that the latter, in turn, notified the victim. We can assume that both of

those individuals, by virtue of their assignments and their military duties to investigate, would have been obligated to warn the accused had they sought to interrogate him. But nothing appears in this record to indicate that Corporal Vaughan was acting as their agent, at their instigation, or on behalf of anyone in an official position. His interest in talking with the accused was not to detect and perfect a case against an offender for purposes of prosecution. On the contrary, his behavior was directed toward getting the incident out of judicial channels and his purpose in finding the offender was clearly that of a victim who had lost $307.00 and who wanted to recoup his losses. A more legitimate personal interest on his part is hard to imagine."

In United States v Hopkins, 7 USCMA 519, 22 CMR 309, we discussed the third condition and made it a part of the formula for purposes of warning. After quoting the provisions of Article 31, we stated:

"When this language is applied to the case before us, the question narrows to one of whether the accused was 'a person suspected of an offense,' for we are in agreement that an incriminating statement made in response to a question not asked for the purposes of crime detection or with intent to aid such an investigation, directed to one who is neither accused nor suspected of an offense, is not rendered inadmissible by the lack of a prior warning. United States v Taylor, 5 USCMA 178, 17 CMR 178; United States v Williams [CM 364607], 11 CMR 521, 526–527. Thus, if the Lieutenant had no cause to suspect the accused of an offense at the time when the admission was made, no duty to warn arose, and the absence of advice as to his rights under that statute would not render the statement inadmissible."

Government counsel rely on these authorities to support the contention that the naval officer did not need to give a warning. I believe the conclusion untenable for, as I interpret the record, all of the conditions have been met in the instant case. It is conceded the store owner just prior to the time of the interrogation was not performing military duties, but he was an officer of the United States Navy and his civilian garb did not change his military status. Therefore, he was subject to the provisions of the Code, and I pass on to discuss the other mentioned factors.

When the accused and his companion arrived, the officer suspected them of an offense, at least, after he was shown the accordion. His testimony shows that prior to his observation he had been alerted to the theft, the property stolen was described, and, when he saw the musical instrument, he knew it was one of those stolen. That evidence is sufficient to show the accused was a suspect and leaves for consideration only the question of whether this was in fact an official military investigation.

The victim was a member of the naval service and, upon discovering the theft, he notified the security officer, furnishing him with the details of the loss and describing the property. The report was furnished to a criminal investigator of the United States Navy. Upon receiving the report and obtaining the facts and circumstances surrounding the theft, the investigator telephoned the music stores and pawnshops in a town adjacent to the naval base. He furnished the businesses with the description of the accordions and requested that if anyone appeared to sell or dispose of the stolen property, he or his headquarters be notified. When the investigator commenced his attempts to catch the offenders, an official criminal investigation had begun and the remaining question which must be answered is, did the officer aid military authorities in the investigation or were his efforts personal?

A reading of the transcript of the testimony convinces me that his activities were solely in aid of the investigation. He was not acting as a "fence" and carrying on a business transaction with the accused for the purpose of purchasing the stolen goods. He knew an offense had been committed, and he

**63**

was solely concerned with delaying tactics, to keep the accused occupied until such time as he could notify the appropriate naval criminal investigator. His questions sought information to establish either joint or separate possession of the stolen goods, and his purpose in getting admissions of ownership was to obtain evidence which would aid in convicting the accused. The officer had no personal interest in the goods which he was trying to protect, he was not the victim of the offense, and he was not seeking to get the details of a crime which was in the process of being completed. From the time he commenced playing in the drama until he ceased being a member of the cast, he was a naval officer acting upon request of naval authorities to aid in solving a crime which was fully committed before his intervention. Accordingly, the nature and character of his service were such as to bring him within the provisions of Article 31 and require a holding that he should have warned before he interrogated.

In some aspects, this case can be likened to United States v Holder, 10 USCMA 448, 28 CMR 14; United States v Smith, 10 USCMA 619, 28 CMR 185; and United States v Taylor, 10 USCMA 621, 28 CMR 187. In those instances, agents of the Federal Bureau of Investigation had interrogated accused persons. The interrogations were part of transactions which resulted in the agents taking custody of the accused and returning them to the military service. The differences between those cases and the one at bar call for different results, but the reasoning remains constant. There the apprehending officers were not subject to the Code, while here they were; and, there the agents were being directed by an agency of the Government not under control of the military, while here the officer was operating directly under instruction from his service. Highlighting the differences, in this case there is a rough sort of agency wherein the principal directs the acts of one who must comply with the law. The argument that this officer was in the same category as other operators of music stores and, therefore, his acts were those of a civilian not subject to military law must fail unless it is established that he acted independently of his service obligations. The record shows to the contrary and, I, therefore, conclude he was required to give a warning.

I do not believe the erroneously admitted evidence had any impact on the findings and sentence of the court. The evidence of guilt was compelling and the incompetent evidence so insignificant, insofar as incrimination is concerned, that it would in no wise influence the findings or sentence of the court-martial. In United States v Williams, 10 USCMA 578, 28 CMR 144, I expressed my belief that every violation of Article 31 does not require a reversal. However, the law has been fixed contrary to my views and, accordingly, I merely concur in the result and join in the disposition.