UNITED STATES, Appellee

v

WILFRID J. BECK, Specialist Four,
U. S. Army, Appellant

15 USCMA 333, 35 CMR 305

No. 18,157

April 30, 1965

*Captain Frank J. Martin, Jr.,* argued the cause for Appellant, Accused.

With him on the brief were *Colonel Joseph L. Chalk* and *Lieutenant Colonel Jacob Hagopian.*

*First Lieutenant Frank J. Penna* argued the cause for Appellee, United States. With him on the brief were *Colonel Edwin G. Schuck* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

FERGUSON, Judge:

Tried by general court-martial convened at Fort George G. Meade, Maryland, the accused was found guilty of aggravated assault, whereby grievous bodily harm was intentionally inflicted, and two counts of simple assault, all in violation of Uniform Code of Military Justice, Article 128, 10 USC § 928. He was sentenced to dishonorable discharge, forfeiture of $100.00 per month for thirty-nine months, and confinement at hard labor for thirty-nine months. The convening authority reduced the period of confinement to two years, the amount and duration of the forfeitures to $46.00 per month for twenty-four months, but otherwise approved the sentence. The board of review affirmed, and we granted accused's petition for review on issues concerning whether certain statements obtained from him should have been excluded from evidence, as a matter of law, and whether the law officer should have submitted to the court the question of the necessity of preliminary advice under Code, supra, Article 31, 10 USC § 831, as the predicate for their consideration.

### I

The nature of the issue before us does not require an extensive review of the evidence regarding accused's guilt. Suffice it to say that the Government established the existence of difficulties between Beck and one Miller, arising out of the former's relationship with the latter's wife. She had left her husband and was living with the accused and his wife in their apartment, located in Cleveland, Ohio. On September 21, 1963, Miller, upon the telephoned invitation of his wife, visited accused's apartment building in order to pick up some toys for his son—then in his custody—and to talk with Beck. He was accompanied by several friends, who remained in the building lobby.

Miller approached accused's apartment and saw him standing outside the door with both wives, all engaged in a conversation with a neighbor. Eventually, at accused's suggestion, he, Miller, and the two women proceeded to the apartment courtyard in order to discuss their difficulties. Once outside, accused engaged in an argument with Miller, accused him of being armed with a knife, and produced a sawed-off shotgun from his clothing. Miller ran back into the building and, closing the door, attempted to secure it in order to bar accused's pursuit. Beck fired through the door, seriously injuring Miller, who stumbled through the building lobby and outside, where he collapsed. Accused followed and pointed his weapon at Miller's companions, accompanying such action with various threats. Local police were summoned, and accused was duly arrested and confined in the local jail.

Accused, appearing in his own behalf, judicially confessed to assaulting Miller with the sawed-off shotgun, but stated that he did not aim the weapon and "didn't mean to shoot Bob Miller, that's all I know, sir." He claimed that Miller ran back into the building and locked the door after him. He fired, as he "just wanted to scare him" but he "didn't mean to shoot Mr. Miller." He felt he was "in danger of bodily harm" from Miller's friends, who were coming down the hall from the lobby toward the door, and "was just firing into the hallway . . . to scare those other guys away, that's all, sir."

### II

Among other witnesses, the prosecution produced a military policeman, Corporal Grimsley, to whom accused allegedly made oral statements bearing on his intent to harm Miller.

Grimsley declared he was a trained

**335**

military policeman, detailed for duty as a dog handler at the accused's station. He and Beck were good friends and had discussed the latter's relationship with Miller's wife. Beck had indicated his dislike for Miller, and stated that "he would beat him to death" if Miller attempted to harm Mrs. Miller. This conversation occurred prior to the incident giving rise to the charges and was no more than a private matter between friends.

On September 22, 1963, however, Grimsley was detailed "[a]s a military policeman" to take custody of the accused at the local civilian jail. Although he had received formal police training at Fort Gordon, Georgia, he had no investigative duties. At the jail, he picked up accused and, accompanied by another guard, started to drive him back to their place of duty. En route, a conversation ensued "between two friends" and not "in line with . . . [Grimsley's] duties." The conversation was initiated by the accused, who told Grimsley that he had better drive straight back to the base, as they were probably being timed. Grimsley testified the events occurred as follows:

". . . I told him, thank you, and we started out. On the way, on the road as we were driving down I mentioned how thin he was getting because he had lost weight in jail and we kidded around about that. I said something to the effect of how did he like it in jail because Specialist Beck was the nervous type of person and hated to be penned up at any time. He said it was hard on him that he wouldn't want to do it again. And I said, 'Well you may have to for a while if things turn out real bad for you'. Then he said that it could happen that way. Then I said something to the effect of was he scared of what may turn out. He said yes he was. And we talked about the CID agent, what he wore and that they were expensive clothes and we would like to be CID agents and everything and we talked about Rutledge and me shooting if he tried to escape, it was in a joking manner. Then specialist Beck got somewhat

serious and we all at the same time mentioned the shooting and got into a serious mood. I asked him if he had hurt Specialist Miller and he said, yes, he really . . . him up. I asked him where he shot him, he said, 'In the face'. About that time we were getting back, sir.

"LO: When did this business about he'd done a good job on him come in?

"WITNESS: Oh, I'm sorry I forgot that. That came in before he said where he had shot him. He said, 'I really done a real good job on him, I . . . him up'. Then I said, 'Where did you shoot him', because I didn't know, he said that he had shot him in the face.

"Q. Why did you ask him if he had hurt Miller?

"A. Like I said, sir, we didn't know for sure.

"Q. You didn't know whether Miller had been hurt?

"A. We had heard that Miller had been hurt but we didn't know how bad he was. We heard he was dying, we heard he'd get out in a couple of days, who would know better, sir, than the man who shot him?"

Grimsley was not sure whether the other guard, one Rutledge, had questioned the accused. He did not report the conversation but volunteered it to the trial counsel during the course of a pretrial interview. Grimsley conceded that he had asked "three questions," *i.e.*, in what part of the body accused had shot Miller, how badly he was injured, and whether Beck was frightened. Accused was not advised of his rights at all under Code, supra, Article 31.

Accused testified concerning the circumstances surrounding the conversations with Grimsley. He declared that the parties were joking about the drive and discussing the CID. As the car proceeded, "we started talking about Miller, what happened and so on like that and he [Grimsley] asked me 'I can't understand why you shot him.'" This question "initiated the conversation" and led to Grimsley's further questions about how badly Miller was

hurt, as well as accused's incriminating responses.

Beck admitted that Grimsley was a "close friend," but did not really talk to him in a friendly capacity. "He mentioned that he had a forty-five on his hip and he told me I was his prisoner. And that was it."

Based on the foregoing, the law officer found "the statement of the accused to Grimsley was not a statement elicited in the course of an official investigation" but was "ordinary conversation." In consequence, he found no need for Grimsley to have advised the accused under the provisions of Code, supra, Article, 31, and admitted Beck's pretrial declarations in evidence.

### III

The questions before us inquire both into the inadmissibility, as a matter of law, of accused's conversation with Grimsley during his return to his unit and whether the issue of the manner in which these statements were obtained should have been submitted under appropriate instructions to the fact finders.

This Court has long held that the preliminary warning under Code, supra, Article 31, is not necessary when it appears that the accused's statement was either spontaneously made or was not "officially" obtained. United States v Workman, 15 USCMA 228, 35 CMR 200; United States v Caliendo, 13 USCMA 405, 32 CMR 405; United States v Dandaneau, 5 USCMA 462, 18 CMR 86; United States v Gibson, 3 USCMA 746, 14 CMR 164. Whether a warning under the Article is required, however, because of the "officiality" of the inquiry necessarily depends upon the facts of each case.

Thus, in United States v Dandaneau, supra, where inculpatory statements were made by the accused " 'on more or less a personal basis' " to an officer who was a friend of his at a chance meeting, and no evidence to the contrary was presented, we held such to be admissible in evidence despite the lack of a preliminary warning. In that connection, we declared, at page 465:

". . . Captain Lucas' own motivation was entirely personal. The record is silent as to the light in which the accused regarded the conversation. It is also silent as to whether he knew that Captain Lucas was the commanding officer of the unit to which he was to be assigned. However, from the informality of the conversation and the place it occurred, it may be inferred that he too regarded the encounter as a casual meeting."

So, too, in United States v Caliendo, supra, where it appeared that accused, among a class suspected of larceny of Government property, voluntarily appeared at his superior's quarters, and inquired as to the consequences of returning the stolen items, we concluded that evidence of such inquiry and the subsequent return of the property was properly received, although there had been no warning delivered. Relative to this, we said, at page 410:

". . . But not every inculpatory statement made by an accused in conversation with another is inadmissible because of a failure to warn him of his rights under Article 31. . . . The prohibition of the Article extends only to statements elicited in the course of an official interrogation. . . . Since Wolf appeared at Sergeant Maflin's residence voluntarily and there was no interrogation or request by the latter resulting in the return of the sheets, there was no necessity for a warning in this instance."

Finally, in United States v Cross, 14 USCMA 660, 34 CMR 440, the Court found a noncommissioned officer acting as steward of an open mess had no duty to advise the accused of his rights before inquiring whether he had thrown a bottle through the mess window. It pointed out that the steward acted not as "a noncommissioned officer exercising disciplinary authority" or "as a law enforcement agent seeking assistance" but only "as a mess manager engaged in the ordinary discharge of his responsibility." United States v Cross, supra, at page 663.

On the other hand, we held a naval

officer on active duty who, in the capacity of a music store proprietor, obtained incriminating admissions from accused without interposition of the requisite warning and for the purpose of insuring their successful prosecution, to be acting "officially" and to have violated the terms of Code, supra, Article 31. United States v Souder, 11 USCMA 59, 28 CMR 283. And in United States v King, 14 USCMA 227, 34 CMR 7, we similarly concluded that an air policeman acting as liaison officer with local civil authorities was required to advise the accused of his rights before interrogating him, even though he purported to question the suspect only on behalf of the civilian police. Finally, in United States v Murphy, 14 USCMA 535, 34 CMR 315, we found a duty to warn the suspected accused present when his enlisted superior accompanied him to an interview by a Secret Service agent, expressed interest in the charges against him, and participated in his interrogation. Of such duty, we said, at page 539:

". . . There is no doubt that Rider was a person 'subject to this chapter.' Moreover, he was accused's immediate enlisted supervisor, expressed interest as such in the allegations against him, and participated in the interview on that basis. While he stated that he was not then acting on behalf of the Air Force, and it is apparent he was not a military detective, the warning requirement of the Article, i.e., officiality, is not so narrowly limited. United States v Souder, 11 USCMA 59, 28 CMR 283; United States v Gibson, 3 USCMA 746, 14 CMR 164. In short, from his testimony, it was open to the court-martial to infer that Rider accompanied accused [to the interview] as his military superior and participated in the interrogation on that basis. As such, it would clearly become his duty to advise Murphy in accordance with Code, supra, Article 31."

From the foregoing, certain, if not always well-defined, principles regarding the need for the preliminary warning emerge. It is certain, for example, that a military investigator, or one acting as such, who suspects an accused of an offense and questions him in connection with such allegations, is expressly required to advise him of his rights. Code, supra, Article 31; United States v King, supra; United States v Souder, supra. At the other end of the spectrum, it is equally clear that inquiries made by a close friend on a personal basis and without regard to any military relationship between him and the accused is not within the ambit of Article 31. United States v Dandaneau, supra. Lying between these two poles are situations involving purported action only on behalf of the civil authorities, participation in interviews by persons not subject to the Code on a claimed private basis, perfunctory inquiries in the ordinary discharge of a nonmilitary type of responsibility, and the lack of any police responsibility on the part of the interrogator. United States v King, United States v Murphy, United States v Cross, all supra. The ultimate inquiry in every case is whether the individual, in line of duty, is acting on behalf of the service or is motivated solely by personal considerations when he seeks to question one whom he suspects of an offense. If the former is true, then the interrogation is clearly official and a preliminary warning is necessitated. United States v King, United States v Murphy, both supra. If the latter situation is presented, then the warning is not required as a predicate for receipt of accused's responses. Beyond these general guiding principles, however, it is impossible to go without reference to specific factual situations, for judicial experience teaches the inadvisibility of attempting to lay out with precision the metes and bounds of the applicability of any positive legal enactment such as the Article in question. Indeed, the undue emphasis which we have in the past sometimes placed on whether the interrogator was a military detective may have misled the law officer here to believe that such was a controlling factor. Cf. United States v Dandaneau, supra. If so, he was in error, for, as the cited cases indicate, the absence of such a role does not necessarily govern the applicability of Article 31. United States v

338

Murphy, supra; United States v Souder, supra.

We offer the foregoing, then, in a spirit of general guidance to those below who are faced with the practical problem of determining the admissibility of confessions and admissions and in order to clarify what we have meant by past references to the requirement of "officiality" in connection with Code, supra, Article 31. It should be clear that this exception to the normal need for advice as to one's rights is narrow in scope and should not be applied lightly in view of the clear Congressional intent to bring almost every disciplinary situation within its remedial shield. Otherwise, as we have said in another connection, the exception soon engulfs the privilege and makes its application the unusual rather than the ordinary situation. Cf. United States v Massey, 15 USCMA 274, 35 CMR 246; United States v Kelley, 7 USCMA 584, 23 CMR 48.

Applying the foregoing to the evidence presented in this record, we cannot hold, as a matter of ▮▮ law, that the law officer should have excluded the accused's conversations with Grimsley while he was in the latter's custody. According to the guard, he and the accused were old friends and the conversation was initiated by Beck. Cf. United States v Caliendo, supra. It was entirely personal, and Grimsley averred that he was acting in a completely unofficial manner when he participated therein—out of motives of curiosity—to the extent of asking three questions. United States v Dandaneau, supra. At the same time, however, neither can we resolve all the evidence against the accused and, as a matter of law, conclude there was no duty on Grimsley's part to advise the accused of his rights under Code, supra, Article 31. Cf. United States v Moore, 15 USCMA 187, 35 CMR 159; United States v Kuefler, 14 USCMA 136, 33 CMR 348.

Thus, despite Grimsley's disclaimer, the court may have inferred that he was acting on behalf of the Army from the fact that he was a trained military policeman; that at the time of the accused's admissions, Grimsley had him in custody and under his control; and that, while he made no immediate, official report of the conversation, he ultimately did disclose it to the prosecutor. Cf. United States v King, supra; United States v Murphy, supra. Moreover, the issue of admissibility is clearly presented by accused's testimony, in which he controverted Grimsley's presentation. Thus, Beck declared the conversation was begun by Grimsley's inquiries concerning his assault on Miller and that, while Grimsley was a friend, on this occasion the relationship was strictly that of an armed guard and his prisoner. From all these factors, it was clearly open to the court-martial to find Grimsley, in talking with the accused, was acting "officially" and thus was under a duty to advise him of his rights under Code, supra, Article 31. The law officer erred in ruling to the contrary and should have submitted the factual issue involved to the court-martial under proper instructions. United States v King, United States v Murphy, both supra; United States v Gorko, 12 USCMA 624, 31 CMR 210.

Ordinarily, an error of this nature in connection with the receipt of pretrial incriminatory statements ▮▮ would require complete reversal. United States v King, supra; United States v Odenweller, 13 USCMA 71, 32 CMR 71. Here, however, the accused judicially confessed to assaulting Miller and the others with a dangerous weapon, and the declarations in question went only to the question whether he thereby intentionally inflicted grievous bodily harm upon his initial victim. Under such circumstances, the prejudice involved goes only to the offense affecting Miller, as found here, and it is open to the board of review either to order a rehearing thereon or to affirm the lesser offense to which accused confessed in his testimony and reassess the sentence. United States v Woodruff, 11 USCMA 268, 29 CMR 84; United States v Kelly, 7 USCMA 218, 22 CMR 8; United States v Smith, 2 USCMA 440, 9 CMR 70. Accordingly, we limit our reversive action.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Army. The board may affirm findings of guilty of assault with a dangerous weapon upon Miller and reassess the sentence on the basis of that offense and the other findings of guilty, or direct a rehearing on the charge of aggravated assault whereby grievous bodily harm was intentionally inflicted and the penalty.

Chief Judge QUINN and Judge KILDAY concur.