UNITED STATES, Appellee

v

RICHARD P. DICKSON, Specialist Four,
U. S. Army, Appellant

16 USCMA 392, 37 CMR 12

No. 19,366

November 18, 1966

*Captain John Kagel* argued the cause for Appellant, Accused. With

him on the brief were *J. Leonard Hyman, Esquire,* and *Lieutenant Colonel Martin S. Drucker.*

*Captain Anthony L. Tersigni* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins, Lieutenant Colonel Francis M. Cooper,* and *Captain Robert B. Lee.*

## Opinion of the Court

KILDAY, Judge:

The accused was convicted of unpremeditated murder and assault in which grievous bodily harm was intentionally inflicted, in violation of Articles 118 and 128, Uniform Code of Military Justice, 10 USC §§ 918 and 928, respectively. His sentence, as reduced by intermediate appellate authorities, consists of dishonorable discharge, total forfeitures, and confinement at hard labor for seven years.

Since the details of the offense do not bear directly on the issues involved a brief summary will suffice.

On the evening of January 8, 1964, the accused forced one W, a fellow serviceman, out of a telephone booth by holding a large knife to the latter's throat. As he emerged from the booth, W struck the accused with his fist and knocked him down. Shortly thereafter, W and the deceased, L, and several other servicemen returned to the scene in a jeep and accused was beaten and struck with an entrenching tool. After the jeep had departed, the accused and several of his friends decided "to go after them." Armed with knives and razors they burst into the barracks. Someone said "I'm going to kill you." W was slashed across his left eye and L received a stab wound in the abdomen from which he died shortly after midnight on January 11th. The present issues evolve from the investigation which followed the above-noted assaults.

On the morning of January 9th, several agents of the Criminal Investigations Detachment came to the orderly room of Captain S, accused's commanding officer, told him that they were investigating the stabbing of L, and that they desired to question the accused. Captain S had accused report to him in front of the orderly room and, in the presence of the Criminal Investigations Detachment agents, told the accused that the agents wanted to question him about the incident. The accused asked Captain S if he could have a lawyer or if he was entitled to a lawyer, and the commanding officer informed the accused that *military counsel would be furnished him if and when there was an Article 32 investigation* and if accused was not satisfied with his military counsel *at that time,* he could obtain a civilian lawyer at his own expense.

On January 11th, Captain S signed charges against the accused and visited him in the stockade. At that time the accused "became more direct in his questioning of his rights to legal counsel." The commanding officer again advised the accused that counsel would be appointed at the time of the Article 32 investigation or that accused could secure civilian counsel then. Subsequently, Captain S visited the accused several times at the stockade and on each occasion the accused asked about counsel and received the same answer. Also on January 11th, Captain S was in contact with Major G, deputy staff judge advocate, relative to the charges and the extent of the commanding officer's responsibilities in the event the parents of any of the servicemen involved, including the accused, came to the base. He was told, "we can worry about that when it happened." When the accused's mother indicated she would visit the base, Captain S arranged for her quarters and called the deputy staff judge advocate. He informed him of her pending arrival and requested advice as to how much of the details of the case he could discuss with her. Captain S was informed he was to do absolutely nothing in the case.

At all times Captain S was motivated by a desire to be of assistance to

the accused, whom he described as "a member of my command" and "an excellent soldier." His answers to the accused's inquiries as to counsel were given in accordance with his knowledge and understanding of the accused's rights therein.

On January 21st, a base chaplain accompanied the accused's mother on her visit to the deputy staff judge advocate. According to his testimony, when Mrs. Dickson expressed concern over the fact that her son did not have counsel, "Major G . . . stated that he understood her interest as a mother in wanting her son to have some counsel, but she wasn't in a position to request the counsel for him, that he would have to request it for himself, and that if he did request the counsel that he would make every effort possible to see that he received counsel. Major G . . . continued to state in a very objective manner that he wasn't sure and none of us were sure that Dickson would even come up for trial, that the case would come up for trial, and he went into details explaining how to—how the various stages of the investigation were moving forward. That the CI investigation had not been completed at that time, and every—after it was completed it would be turned over to the unit for the Article 32 investigation and after the Article 32 investigation he explained the various steps it would take prior to the formal charges and he explained, he mentioned that it was possible that it might not come to trial and might come to trial."

In view of the seriousness of the charges, the chaplain testified that he believed there was a very good likelihood that the case would come to trial; and since he did not want Mrs. Dickson to leave with a contrary impression, he inquired of Major G as to just what the procedure was for securing counsel for the accused. When he was told that Dickson personally would have to make such a request, the chaplain stated he "would be willing to go to the stockade and talk to Dickson and let him know about this, because

I was under the assumption that he didn't know the exact procedure."

Upon arrival at the stockade, the chaplain further testified:

". . . I asked him if he had received counsel, he said no, that he was waiting for someone to come. And I said do you feel that you will get counsel without asking for it. He said he had talked it over with his commanding officer and he told him counsel would be sent to see him. And he was sitting waiting for counsel to come."

When the chaplain explained to the accused the procedure previously outlined to him and Mrs. Dickson by Major G, the accused stated that he would fill out the request form as "he was anxious to have a counselor to give him advice as to the procedures and what to say and other matters." The chaplain then telephonically informed Major G of this development and the latter assured him the counsel would be appointed as soon as possible.

With regard to this particular matter, Major G testified, in response to inquiry by defense counsel, that he did not believe Mrs. Dickson made a specific request that counsel be made available to her son. Counsel then inquired:

"Q. You do not recall?

"A. I informed Mrs. Dickson that if the case were referred to a general court martial that in that event her son would be entitled to retain civilian counsel at his or her expense, he would have a right in addition or as an alternative in any event to qualified military Judge Advocate counsel, all he had to do would be to request it. Or, that he could request any other individual Judge Advocate not assigned to our office, and if that officer were reasonably available, that he might obtain counsel of his particular choice by name.

"Q. You did not recall telling her that—You do not recall she requested that counsel be made available

to consult with her son immediately?

"A. Mrs. Dickson asked me if her son desired to consult with counsel would this be permissible, and I told her yes, if her son wanted to consult with counsel, all he had to do was make that fact known to our office, and that if he did that request would be honored.

"Chaplain Powell, who was in the office at that time had just come from the stockade, as I recall, or had been visiting periodically with Specialist Dickson, and I informed Captain Powell, that if the request were made to transmit it to me, he was in close contact with Dickson. And I also informed Mrs. Dickson that if he did want to consult with counsel that all he had to do was fill out an interview slip request at the stockade, that there was a procedure for this, and all he had to do is indicate it that way or let Chaplain Powell know. He told me he was going back down to see Dickson that afternoon or the following morning, and just to let me know."

A special agent of the Criminal Investigations Detachment testified to the taking of a statement from the accused on January 9th, and another on January 21st. In the first statement accused recounted the details of the incident at the phone booth and his subsequent deliberate cutting of the man with whom he had had the fight. In the second he admitted ownership of a knife found on January 18th just outside his barracks window, and stated that it was the same knife he had in his possession on the night of January 8th, in the barracks of the victims W and L. The Criminal Investigations Detachment agent testified that he gave a proper Article 31 warning to the accused on January 9th, but made no mention of a right to counsel, nor did the accused raise the question. On the 21st, however, prior to the taking of the statement, the accused advised the agent that his mother had visited him and that she had gone to the Judge Advocate in an effort to obtain counsel for him. Despite the fact that the agent had previously discussed the case with Major G, and specifically the finding of the knife, he continued the interrogation and did not make any effort to determine whether counsel had been appointed for the accused.

At trial, defense counsel vigorously contested the admissibility of these statements into evidence essentially on the ground that the accused had been originally and continually misadvised as to the right to counsel by his commanding officer, on whom he had the right to rely, while that officer was acting in his official capacity. The Government's contention as to the official nature of the actions and advice of Captain S was to the contrary, and after extensive argument by both sides the law officer allowed the statements into evidence. We granted the accused's petition for review to consider the correctness of the law officer's ruling in this regard.

We believe he erred therein to the substantial prejudice of the accused. We will not belabor the point for the basic issue of official misadvice to an accused as to his right to counsel, and we so find in this case, was thoroughly explored and decided by this Court in United States v Gunnels, 8 USCMA 130, 23 CMR 354, and United States v Rose, 8 USCMA 441, 24 CMR 251. Essentially we held therein that while a suspect has no right to the appointment of military counsel, he most assuredly has a right to consult with a lawyer of his own choice or with the staff judge advocate. Cf. Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966). The interested reader is referred to those opinions. Suffice it to say that when the accused inquired of his commanding officer, before whom he appeared in response to an official request by that officer, "'Am I entitled to a lawyer?'" his right to correct advice as to this constitutional privilege (United States Constitution, Amendment VI; Powell v Alabama, 287 US 45, 69, 77 L ed 158, 53 S Ct 55 (1932)) was established. *Gunnels* and *Rose*, both supra.

The Government argues, however,

that at that time the commanding officer was acting in a private and non-law enforcement capacity and that "The Government should not be penalized for the allegedly misleading statements of Captain S . . . unless he acted on the Government's behalf when he spoke to advise the appellant." We agree that a different question might be presented if there were any evidence that the commanding officer had been acting in a private capacity when the accused proffered his inquiry. United States v Dandaneau, 5 USCMA 462, 18 CMR 86. But all of the evidence is to the contrary, as noted above, and need not be restated. Indeed, the commanding officer left no doubt thereof when he testified:

> "I advise any man as to his rights who is a *member of my command* or any other member who might seek my help in any way I am qualified." [Emphasis supplied.]

Subsequently, he signed charges against the accused, ordered him into the stockade and visited him there because "The post requires unit commanders visit personnel in the stockade every thirty days, I try to do it once every two weeks." At all times he obviously was acting in an official capacity, and we commend the Captain on his interest in the men over whom he exercises authority and on his efforts to be of assistance to them.

If "officiality" of action is sufficient to satisfy the requirements of Article 31, Uniform Code of Military Justice, 10 USC § 831 (see the discussion of this issue in United States v Beck, 15 USCMA 333, 338, 35 CMR 305, 310), can it be said that more is required (*i.e.*, law enforcement capacity) in a situation such as that which pertains in this case? We think not. In the event more is needed, however, we have ofttimes equated the official actions of a commanding officer to those of a Federal magistrate (see United States v Hartsook, 15 USCMA 291, 35 CMR 263), and certainly the latter's responsibility in this regard is unquestioned.

We hold, therefore, that since both statements were obtained from the accused at times when he had reason to believe he was not entitled to the advice of counsel, their admission into evidence was error prejudicial to the substantial rights of the accused.

We cannot leave this matter, however, without some comment on the "advice" of the deputy staff judge advocate to the mother of the accused. Setting aside the chaplain's testimony that Major G told Mrs. Dickson "she wasn't in a position to request the counsel for him [the accused], that he would have to request it for himself," and that "he wasn't sure and none of us were sure that Dickson would even come up for trial," we are confounded by his own apparent equivocation and misadvice. In his testimony he admitted that he "informed Mrs. Dickson that *if the case were referred to a general court martial that in that event* her son would be entitled to retain civilian counsel at his or her expense, he would have a right in addition or as an alternative in any event to qualified military Judge Advocate counsel, all he had to do would be to request it." (Emphasis supplied.) While absolutes are difficult to pinpoint or identify, the probability of this case coming to trial was exceedingly high in view of the fact that the accused was in pretrial confinement and had already been charged with two major offenses—premeditated murder and assault whereby grievous bodily harm was intentionally inflicted; and that trial by general court-martial had been recommended by the unit and battalion commanders. Since he had been informed by the Criminal Investigations Detachment agent as to the finding of the knife outside Dickson's barracks and had maintained regular contact with him as to the progress of the case, it is logical to assume that he was also aware of the initial statement executed by the accused. Under these circumstances his "uncertainty" as to the probability of trial is not understandable.

Of deeper concern is his statement that *in the event* of referral to a general court-martial the accused would be entitled to retain civilian counsel and

have a right as an alternative or in addition to the assistance of military counsel as well. This advice is clearly in error for even one suspected of crime may seek advice of counsel, either one privately retained or the staff judge advocate. This is the holding of *Gunnels* and *Rose,* both supra. In view of our holding, we find it un-necessary to decide whether this error prejudiced the accused's trial.

The decision of the board of review is reversed. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge QUINN and Judge FERGUSON concur.