UNITED STATES, Appellee

v

CECIL J. HINKSON, Lance Corporal,
U. S. Marine Corps, Appellant

17 USCMA 126, 37 CMR 390

No. 19,944

July 7, 1967

*Lieutenant Clinton F. Raymond,* USNR, argued the cause for Appellant, Accused. With him on the brief was *Captain Anthony A. Vertuno,* USMC.

*Lieutenant Edward A. Infante,* USNR, argued the cause for Appellee, United States. With him on the brief was *Lieutenant Jean E. Van Slate,* USN.

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial in Okinawa convicted the accused of larceny of Government property and the wrongful sale thereof to an Okinawan, in violation of Articles 121 and 108, Uniform Code of Military Justice, 10 USC §§ 921 and 908, respectively. On this appeal he contends that certain pretrial statements made by him were improperly admitted in evidence.

In late September 1965, Lance Corporal Thomas J. Sasso overheard some conversation between two Marines at a bar in Okinawa. They were "bragging" about the money they made in black-market sales of stolen Marine Corps "gear." Sasso had a "pretty good idea" the equipment was going "to the Viets." Apparently disturbed by the incident, he reported it the next day to his executive officer, who communicated with the Office of Naval Intelligence. As a result, two agents conferred with Sasso. He related what he had heard, and indicated to the agents he would like to help "expose" the illegal traffic. They agreed that Sasso could "work" with them by pretending he was engaged in illegal transactions with Okinawans. The agents and Sasso arranged to maintain "close contact" so that Sasso could report what he heard and observed. Agent Bernard Taylor explicity instructed Sasso he

was not "to question anybody" about anything, and was to "make damned sure" he did not say " '[l]et's do this and let's do that,' " because that would constitute "entrapment."

After his conference with the agents, Sasso began "to play it bad" to establish an unsavory reputation. He learned about a number of illegal activities which he reported to the agents. One of his reports implicated Private First Class Marvin K. Minson in the theft of Government property. Questioned on November 8, 1965, by ONI agents, Minson admitted he committed numerous thefts in conjunction with different persons, and he identified the accused as one of the latter. On December 13, 1965, Sasso conferred with Agent Taylor in his office in the quonset hut occupied by the ONI. The office opened on a small waiting room. As Sasso left the office and entered the waiting room, he remarked over his shoulder, " '[y]ou ain't getting nothing out of me.' " His remark was calculated to make the people in the waiting room think he was a suspect. Three persons were in the waiting room; one was the accused. Within a few moments two of the others were called in for questioning, leaving Sasso alone with the accused.

Sasso had not previously met the accused, and did not know him by name, but he knew he was present for questioning. Although not certain, Sasso admitted it was "very possible" he started a conversation with the accused. He told the accused he was involved in some "runs" (the theft and sale of Government property), and "some of the guys were talking" but ,others "weren't." Sasso asked no questions of the accused, but hoped he "would talk." The accused did. He told Sasso he had stolen more than thirty sections of pipe, which he later sold.

At trial, defense counsel objected to Sasso's testimony as to the accused's incriminating statements on the ground he was a "de facto" agent and should have warned the accused of his rights under Article 31 of the Uniform Code before talking to him. The law officer overruled the objection, and admitted the testimony. On this appeal, the accused has enlarged his trial objection to include an allegation that the procedure by which the statements were obtained deprived him of his constitutional right to counsel.

We are not inclined to denigrate or defend Sasso's relationship to the ONI. Whether he was an "informer," with the overlay of opprobrium that term implies, or a conscientious and courageous Marine who deserved the thanks of the law-abiding community, is immaterial to the questions before us. Neither the Uniform Code of Military Justice nor the Constitution of the United States requires that, at all times and in all situations, a person desiring to learn about the criminal activities of another first proclaim himself an arm of the law, or one dedicated to its enforcement. Long ago we held that the Article 31 requirement that an accused or suspect not be interrogated or requested to make a statement without first being advised of his right to remain silent, does not apply to an undercover agent who merely engages in ordinary conversation with an unwary suspect. United States v Gibson, 3 USCMA 746, 14 CMR 164. Similarly, the Supreme Court of the United States has determined that conversations between a suspect and a person secretly cooperating with the police do not violate the Fifth Amendment's prohibition against compulsory self-incrimination. Hoffa v United States, 385 US 293, 17 L ed 2d 374, 87 S Ct 408, 414 (1966). The record before us demonstrates that no promise, direct or implied, was made to the accused that he could converse with Sasso in confidence. Cf. United States v Green, 15 USCMA 300, 35 CMR 272.

Relying upon Massiah v United States, 377 US 201, 12 L ed 2d 246, 84 S Ct 1199 (1964), appellate defense counsel contend the pretrial statements were obtained in deprivation of the accused's right to counsel. Decisions of the Supreme Court of the United States as to scope of this constitutional privilege are applicable to the military. United States v Tempia, 16 USCMA 629, 37 CMR 249. However, the facts in this case are different from those in *Massiah*. There, the accused and a companion, Colson, were indicted for

conspiracy to possess narcotics. Colson decided to cooperate with Federal agents investigating ramifications of the conspiracy. With his consent, a radio transmitter was concealed under the front seat of his car. Later, he succeeded in engaging the accused in conversation in the car. The conversation was transmitted to, and recorded by, the agents. At trial, the defense objected to the admission in evidence of the statements made by the accused on the ground he had been deprived of his right to counsel. The Supreme Court sustained the contention. It held that, *after indictment,* a defendant cannot be interrogated either by the police or a person cooperating with them, without first being advised of his right to counsel. Here, the accused was not under charges when he conversed with Sasso; and, by fair inference, it appears he was not even under arrest. In the *Tempia* case, we recognized that an order or direction to an accused to report to a law enforcement agent's office for questioning is a significant deprivation of his freedom of action and makes the conditions of his interrogation by the agent comparable to the "custodial interrogation" which the Supreme Court held requires preliminary advice as to the right to counsel at the interrogation. Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966). We are not informed as to the circumstances of the accused's appearance at the ONI office, but an assumption that he was there by direction is no help to him. No element of custodial coercion confronted him. Sasso represented himself not as an arm of the law, but as its enemy. He appeared as a self-confessed criminal. The fact that Sasso was not in truth the kind of person the accused believed him to be was the risk he took when he engaged in the conversation. Lopez v United States, 373 US 427, 10 L ed 2d 462, 83 S Ct 1381 (1963).

No inherent compulsion of a police atmosphere appear in the conversation between Sasso and the accused. Sasso testified he asked no questions. After listening to Sasso's story of criminal conduct, the accused elected to disclose his own complicity in a similar crime. His choice was not the product of a false sense of security induced by a friendly official. Cf. United States v Beck, 15 USCMA 333, 35 CMR 305. Sasso was not the accused's friend, and had never before talked to him. In their conversation none of the accused's weaknesses of intellect or fortitude were pitted against the powers, real or imagined, of the Government. The only picture which emerges from the record is that of a completely casual conversation between strangers. And the only kind of pressure discernible in the situation, if it can be described as such, is that human quality which leads one person to talk about *his* life when he hears another discussing his own. The hope by an undercover agent that a suspect will talk in response to that human quality is not coercion or unlawful influence. See Osborn v United States, 385 US 323, 17 L ed 2d 394, 87 S Ct 429 (1966). Had the conversation between Sasso and the accused taken place on a park bench, at a bar, or in the accused's own quarters, there could be no doubt as to the admissibility of the accused's incriminatory statements. Hoffa v United States, supra. The fact that the conversation took place in the waiting room of a police station does not cloak it with a constitutional immunity greater than that present in other public places. See Lanza v New York, 370 US 139, 145, 8 L ed 2d 384, 82 S Ct 1218 (1962). As we read the record, it demonstrates that the pretrial statements were freely made, without coercion or inducement and under circumstances which did not require preliminary advice as to the right to remain silent and the right to counsel. See Morgan v United States, 377 F2d 507 (CA 1st Cir) (1967). There was no "custodial interrogation," as postulated in *Miranda,* and no pending proceeding entitling the accused to counsel, as defined in *Messiah.*

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

128

That the Government may plant an informer in criminal councils and thereafter use statements made by an accused to him or in his presence is undoubtedly true. Hoffa v United States, 385 US 293, 17 L ed 2d 374, 87 S Ct 408 (1966); Osborn v United States, 385 US 323, 17 L ed 2d 394, 87 S Ct 429 (1966). But, in my view, the Government's privilege to do so must end when the accused is taken into custody or otherwise subjected to interrogation as a suspect. Absent such limitation, the Government is permitted not only directly to evade the duty cast upon it by Uniform Code of Military Justice, Article 31, 10 USC § 831, but, also, despite the holding in Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966), to deny the accused both the opportunity to seek and to consult with legal counsel. The mask of the informer is undoubtedly necessary to criminal investigations, but it must be laid aside at the door of the police station.

The record before us clearly demonstrates that Lance Corporal Sasso, acting as an agent of the Office of Naval Intelligence, successfully sought to secure a statement from the accused by pretending to be a fellow criminal and gaining his confidence. Contrary to my associates, I believe there is a great deal of difference between one who is approached "on a park bench, at a bar, or in the accused's own quarters" and one in custody who is approached by a policeman in a police station. I should have thought that Miranda, supra, and our own decision in United States v Tempia, 16 USCMA 629, 37 CMR 249, made that distinction crystal clear. If not, I believe a review of the facts pertinent here will at least point it up to the reader.

Corporal Sasso volunteered his services to the Office of Naval Intelligence in September 1965. He operated as an undercover agent with a group involved in theft of various items of Government property. By December 1965, the investigating phase was apparently completed, and the net closed on the suspects, including the accused. During the entire operation, Sasso was never involved with the accused, nor

had he spoken to him. However, on December 12, 1965, the accused was present in the station house and "waiting to be interrogated." Sasso's duties with the Office of Naval Intelligence included reporting to Agent Taylor anything that was said to him by any suspect. Taylor brought Sasso to the room in which accused awaited interrogation. Sasso and Taylor "were pretending, to anyone that might be watching" that the former was "actually a suspect and . . . one of the ringleaders." Sasso, in accused's presence, told Taylor, " 'You ain't getting nothing out of me.' " Taylor left, and Sasso sat down near the accused.

Sasso had worked closely with Taylor and had been especially cautioned not to interrogate anyone directly. However, he started a conversation with the accused, in which he painted himself as a criminal. He did not directly question accused. The process which he followed is best pictured in Sasso's own words:

". . . I remember specially when I went in there, I said to myself, I will talk freely, or else he will talk freely, and we will get a conversation started. I will make sure that I won't ask him questions. I said that to myself. If the conversation got started, I would not ask any questions, and use the word entrapment, [sic] and say it is my fault."

Sasso's purpose was to secure an incriminatory statement from the accused, but without direct questioning, as "Mr. Taylor strongly impressed upon me about interrogating or trying to entrap some witness, sir." Sasso succeeded admirably, for, without the intervention of any advice under Code, supra, Article 31, he obtained a full confession to the theft charged. He promptly reported this to Agent Taylor, only to discover that the room was "bugged" and Taylor had listened to the entire proceedings.

Code, supra, Article 31, provides pertinently that:

"(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense with-

**129**

out first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."

In United States v Beck, 15 USCMA 333, 35 CMR 305, a unamimous Court pointed out the duty to advise an accused or suspect of his rights under Code, supra, Article 31, prior to obtaining a statement from him. The exceptions to this rule, we said, were those involving spontaneous declarations by the accused and unofficial interrogations. In determining whether the inquiry was "official," we said, at page 338:

". . . The ultimate inquiry in every case is whether the individual, in line of duty, is acting on behalf of the service or is motivated solely by personal considerations when he seeks to question one whom he suspects of an offense. *If the former is true, then the interrogation is clearly official and a preliminary warning is necessitated.*" [Emphasis supplied.]

In that case, Beck was a friend of his questioner, who was normally a police dog handler. Assigned to guard Beck *en route* from a civilian jail to their place of duty, they conversed as two friends and not "officially." We nevertheless unanimously concluded that, absent a warning under Code, supra, Article 31, a strong issue of admissibility was raised. We clearly pointed out the duty to warn a suspect, even if the interrogator was not an investigator, if he acted in line of duty. Otherwise, we said, "the exception soon engulfs the privilege and makes its application the unusual rather than the ordinary situation." *Beck, supra,* at page 339.

So, also, in United States v Murphy, 14 USCMA 535, 34 CMR 315, we again unanimously placed the duty to warn an accused on *all who are subject to the Code* and who suspect the individual concerned of past criminal conduct. There, a sergeant accompanied the defendant to an interview by a Treasury Department agent. As he took part therein, we found he had the duty to advise the accused even though he was not a military detective. *Inter alia,* we declared that "the warning requirement of the Article, *i. e.,* officiality, is not so narrowly limited." *Murphy, supra,* at page 539.

And in United States v King, 14 USCMA 227, 34 CMR 7, wherein the statement was obtained by a military investigator on behalf of civilian authorities, we unequivocally declared, at page 231:

". . . Yet, Foster, an enlisted member of the Air Force, was clearly 'subject to this chapter,' and, suspecting accused of the very offenses with which he was ultimately charged, interrogated him concerning these crimes. As such, it was his duty under Code, supra, Article 31, to advise accused of his rights regardless of whether he was taking a statement on behalf of the Air Force or the Texas authorities. The very words of the enactment command it, and the reasoning which led us to exempt civilians from its requirements unless they were acting on behalf of the military cannot be perverted into an exemption for him simply because he may have been acting on behalf of local authorities."

The foregoing decisions—each of them unanimous—apply the terms of Code, supra, Article 31, as written. Its requirements are plainly stated; they are unambiguous and require neither construction nor strained analysis. It plainly and clearly says that *"No person subject to this chapter may interrogate, or request any statement from,"* (emphasis supplied) an accused or suspect without initially delivering the stated warning. It cannot be argued that Sasso is not a "person subject to this chapter" for he was a Lance Corporal on active duty. It likewise expressly appears from the record that he suspected accused of theft of Government property. He was, further, clearly acting "officially," *i. e.,* in the line of duty, as an agent of the Office of Naval Intelligence, by appearing in the room and inducing accused to speak. Indeed,

his sole purpose in seating himself near the accused, after having played out the charade with Agent Taylor, was to obtain an incriminatory statement from him. Sasso admitted as much. Finally, there was clearly an interrogation or request for a statement by the accused. In Sasso's own words, his idea in approaching accused was that "I will talk freely, . . . and we will get a conversation started," hopefully one which would incriminate the accused. His hopes succeeded and, indeed, the entire process was electronically monitored by Taylor.

In short, what we have here is an agent of the Office of Naval Intelligence, who has worked with it for months, being allowed to conceal his identity and, without the necessary preliminary warning, to interrogate an accused in custody, concerning a crime of which he is suspected; and thereafter to testify to the confession which he secured. The substance of my brothers' position seems to be that if a military policeman openly announces himself as such, after the suspect's arrest, he must advise the accused of his rights and see that they are protected. But, if he pins his badge to his underwear, carefully conceals his identity as a cop, and approaches the accused on an histrionic basis, he is, by reason of his acting ability, excused from complying with the mandate of the Congress. With this, I cannot agree, and I would, in consequence, hold the statement inadmissible as having been officially obtained by a police agent during the course of investigating and impliedly interrogating an accused in custody.

Turning to the rationale of the principal opinion, it is at once apparent that its reasoning, like the Biblical structure, is built of bricks without straw. Thus, it merely states the conclusion that Code, supra, Article 31, does not apply to an undercover agent who engages in ordinary conversation with an unwary suspect. United States v Gibson, 3 USCMA 746, 14 CMR 164, indeed, supports that proposition, but it is clearly distinguishable. There, the informant, a cell mate of the accused, did not know he was acting for the Criminal Investigations Detachment when he asked accused why he was in confinement, nor, indeed, was he seeking to obtain information for the investigators. Only after the discoveries were made was he asked whether any incriminatory admissions had been received from the accused. In short, he "ratted" on Gibson, but when the latter confessed, the cell mate was not an investigator. See concurring opinion, Judge Latimer, United States v Gibson, supra, at page 763. Language in the Chief Judge's opinion in that case may be susceptible of the interpretation he here places on it, but, on the facts, it should not be so extended. If so, then Judge Latimer well stated therein, at page 757:

". . . I would, however, suggest that a rule which grants to an informer the right to violate a statute which controls other members of the armed services is so repugnant to the ordinary concepts of common sense that it ought to be struck down and never revived."

Similarly, Hoffa v United States, supra, does not support the Chief Judge's position. There, the informer was operating in Hoffa's councils during the commission of or attempt to commit the very crime for which he was tried. Here, the accused was in custody—in Sasso's words—awaiting interrogation. The Supreme Court did no more than reaffirm the traditional role of the undercover agent; not a single word of its opinion states that the police may, after arrest and during custodial interrogation, evade the requirement for a statutory warning, by pretending one of its agents is a crook. Indeed, it defies belief blandly to assert that, as to future prosecutions, the Government may avoid the new interrogation rules regarding counsel and warning by the simple device of deceiving the accused into believing, after his arrest, that his interrogator is a criminal and not a policeman. If *Miranda,* supra, and United States v Tempia, supra, are so easily avoided, then I wonder why the Supreme Court and this Court went to so much trouble to protect an individual's constitutional rights. Such transparent evasions are well within the prohibition of Gouled v

United States, 255 US 298, 65 L ed 647, 41 S Ct 261 (1921), wherein it was pointed out that a violation of the law was no less a violation because it is committed by stealth rather than by force and coercion. It is well also to recall to our attention the language in that case that fundamental protections "should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts, or by well-intentioned but mistakenly overzealous executive officers." Gouled v United States, supra, at page 304.

Moreover, I consider the decision here contrary in both spirit and letter to our opinions in United States v Tempia, supra, adopting the formulae laid down in Miranda v Arizona, supra, as well as those of the Supreme Court in Massiah v United States, 377 US 201, 12 L ed 2d 246, 84 S Ct 1199 (1964) and United States v Wade, 388 US 218, 18 L ed 2d 1149, 87 S Ct 1926 (1967). *Massiah*, supra, lays down the flat prohibition against the use of informers by police following indictment to secure information from a defendant in the absence of his counsel. It points up that, at that stage in the criminal process, the individual is at least clearly entitled to the services of a lawyer, and may not be surreptitiously deprived of them. Miranda v Arizona, supra, and United States v Tempia, supra, undoubtedly move that entitlement to an attorney back to the police investigatory period. Indeed, any doubt about this proposition is at once eliminated by reference to the Supreme Court's decision in United States v Wade, supra, wherein the right to counsel is extended even to police lineups. True enough, this case was tried before *Miranda*, supra, became effective, but can it be gainsaid that the accused, while in custody, was nonetheless denied the opportunity to seek out and consult with counsel and to make an informed decision as to speaking or remaining silent through the surreptitious introduction of Sasso as a criminal rather than in his true character?

In sum, then, I am convinced that a statutory requirement such as Code, supra, Article 31, may not be avoided by an agent's simply pretending he is not an agent. The informer's role must disappear once the door of the police station closes on the accused and he is in custody or otherwise deprived of his freedom in a significant way. To hold otherwise simply means that the compliance with statutory (and now constitutional) standards depends not on the rules laid down by Congress and the Supreme Court but upon the artifice of a police officer—the very sort of practices which the Supreme Court catalogued in *Miranda*, supra, and which led it to lay down the doctrine enunciated therein. In any event, I cannot subscribe to such a pernicious conclusion, and note my disagreement.

I would reverse the decision of the board of review and order a rehearing.