UNITED STATES, Appellee

v

JAMES I. McCRARY, Airman Basic,
U. S. Air Force, Appellant

18 USCMA 104, 39 CMR 104

No. 21,264

January 24, 1969

*Captain John T. Dorman* argued the cause for Appellant, Accused. With him on the brief were *Colonel Dwight R. Rowland* and *Colonel Joseph E. Krysakowski.*

*Major Robert W. Vayda* argued the cause for Appellee, United States. With him on the brief was *Colonel James R. Thorn.*

QUINN, Chief Judge:

A general court-martial convicted the accused of three specifications of larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, and imposed a sentence extending to a bad-conduct discharge and confinement at hard labor for one year. With some modification of the sentence, intermediate appellate authorities affirmed the conviction. The accused appealed to this Court, alleging two assignments of error. In the first, he contends certain evidence admitted against him at trial was obtained as the result of an illegal search. In the second assignment, he maintains the evidence is insufficient to support the findings of guilty of two of the three offenses.

The accused was a prisoner in the base stockade at Hill Air Force Base, Utah. He had been convicted of larceny by a general court-martial, and had been sentenced to confinement and a punitive discharge. However, the sentence had been ameliorated by the Judge Advocate General of the Air Force, who also directed that the accused be transferred to a retraining group at Lowry Air Force Base, Colorado. The transfer was to be effected not later than December 21, 1967. To accomplish the administrative arrangements necessary for transfer, the accused was released from confinement to his squadron on December 12. Airman C. W. Cupp was detailed to "escort him around . . . to clear the base" as expeditiously as possible. A squadron vehicle was assigned to Cupp for that purpose. Some of the details of transfer were accomplished that day. During part of the day, Cupp had turned over the accused to another escort. As a result, when directed the next day to escort the accused again to complete the clearance requirements, he was ordered by Major W. A. Williams, the squadron executive officer, "not to leave . . . [the accused] out of his sight."

Cupp picked up the accused at the stockade and continued with the proc-

essing schedule. At the Base Equipment Management Office (BEMO), an inventory of items charged to the accused disclosed he was short a pair of coveralls. The accused informed Cupp the garment was in his car, and he indicated he wanted to turn it in rather than sign a statement of charges for the value. Cupp telephoned Major Williams for instructions. He advised the Major "what the problem was" and asked whether he should have the accused "sign a statement of charges or what." Apprised that the accused desired to turn in the coveralls, Major Williams gave Cupp permission to drive the accused to his car to get them. When Cupp told the accused they could go to the car, the accused informed him that Airman D. E. Risley had the car keys, and he thought Risley was away. Cupp decided to return to the orderly room to consult Major Williams.

At the orderly room, Cupp told Major Williams that Risley had the keys to the car, but, according to the accused, Risley was off duty. Cupp also told Major Williams that en route to the orderly room he had asked the accused whether there "was anything in the car that [was not his and which] he didn't want found," and the accused had informed him he had a parka in the car which belonged to another airman. Williams telephoned Risley's section and ascertained he was still present. He instructed Cupp "to take . . . [the accused] down and get the key from Risley, go to the car and get the coveralls and give them back to BEMO." He further instructed Cupp to take the parka if it was "government property" and "bring it back in the staff car."

Leaving the orderly room, Cupp escorted the accused to his next appointment. When that was concluded, they drove to Risley's duty section. There, they picked up Risley and proceeded to his barracks to obtain the keys to the accused's car. While Cupp and the accused remained in or near the staff car, Risley went to his room

for the keys. On his return, Cupp took the keys from Risley. Since the accused had told him the coveralls were in the trunk of the car, he went directly to the trunk. Opening it, he saw "all kinds" of articles. A great many of these appeared to be "government stuff," and Cupp decided to look into the interior of the car. He saw a tool. The accused told him the tool belonged to a friend, but Cupp replied that "it looks government to me." Thereupon, he opened the locked doors to look at it. He inspected the interior, including the glove compartment. He saw another tool under the front seat and a number of stereo tape cartridges on the front seat and in the glove compartment. Cupp removed everything from the trunk that he believed belonged to the Government and the two tools, and transferred the articles to the staff car. He left many articles of personal property, including a black stereo tape case in the trunk.

Cupp returned directly to the orderly room to report to Major Williams. When the latter saw the property Cupp had brought back, he referred the matter to the security police. A security investigator interviewed Cupp, and Cupp related what he had seen in the trunk of the accused's car. On the basis of the information received from Cupp, the investigator obtained authorization to search the accused's car from the deputy base commander, who had been empowered by the base commander to act on applications to search. A search of the car was then made by the agent, and a stereo tape case and several stereo tape cartridges were seized. Over defense objection, these were admitted in evidence against the accused.

In the accused's view, Cupp's conduct was illegal, and this illegality tainted the search and seizure authorized by the deputy base commander. See Silverthorne Lumber Co. v United States, 251 US 385, 64 L Ed 319, 40 S Ct 182 (1920); United States v Haynes, 9 USCMA 792, 27 CMR 60; United States v Seiber, 12 USCMA 520, 31 CMR 106. He contends first that, during the ride from BEMO to

**106**

the orderly room, Cupp should have, but did not, advise him of his right to remain silent; consequently, his statement to Cupp that he had property belonging to another in his car could not be, but was, used against him. Next, he maintains that Cupp's conduct at the car constituted an illegal search, with the result that whatever Cupp saw could not be used in the application to the deputy base commander for permission to search the car. See United States v Kauffman, 14 USCMA 283, 34 CMR 63. Both contentions were considered, but rejected, by the board of review. It determined that the improprieties of Cupp's conduct did not affect the lawfulness of his act of opening the trunk of the accused's car and the legality of his report as to the property he saw therein. See United States v Kazmierczak, 16 USCMA 594, 37 CMR 214.

Among other things, the board of review reasoned there was no necessity for Cupp to advise the accused of his right to remain silent because there was "no indication that the accused was suspected of any offense whatever at the time Cupp asked him if there was anything in his automobile he did not wish to have found." It concluded that Cupp's question was asked "conversationally, informally and on a personal basis." See United States v Dandaneau, 5 USCMA 462, 18 CMR 86. However, Cupp admitted that his responsibility for obtaining accused's clearance from the base included clearance of the accused's car. He also admitted he asked the question about other property in the car because he was "just carrying out . . . [his] job." Cupp was assigned to duty in the orderly room. It may be reasonably inferred, as defense counsel contend, that he knew the accused had been convicted of larceny. It appears, therefore, that he at least suspected the accused might have property in his possession which did not belong to him and which he might not want "found." Accused's possession of the property of others might delay his clearance. Cupp's question, therefore,

appears to be more a desire on Cupp's part to secure the accused's clearance than an incident in a personal conversation. Under the circumstances, Cupp was required to advise the accused he had a right to remain silent. United States v Beck, 15 USCMA 333, 35 CMR 305.

Also crucial to the board of review's decision was a finding that it was at "the accused's instigation, ▉▉▉▉▉▉ ▉ and with his cooperation that he and Cupp went to the automobile to obtain the coveralls." This finding is not determinative of the issue. While the decision to get the coveralls originated with the accused, it is clear that the way in which they were obtained was not of the accused's choosing and with his consent. On the contrary, the evidence demonstrates that the accused was prevented from obtaining the coveralls in a way that would keep Cupp from seeing what other property, if any, was in the car. Cupp had been ordered by Major Williams to "get the key from Risley, go to the car" and seize anything he found there that looked like Government property. From the evidence, it is plain that in carrying out this order Cupp's primary concern was not just to enable Cupp to procure the coveralls so that they could be turned in to BEMO for clearance, but to seize any Government property he could find. On cross-examination, he admitted that he "went down there and opened the trunk to retrieve the coveralls and anything [else] government." He ordered the accused to "just sit" in the squadron vehicle while he took the accused's car keys from Risley and proceeded to open the trunk of the accused's car. Not a word of testimony suggests that the accused consented to these acts. Cupp, in fact, admitted the accused had earlier offered to make other arrangements to obtain the coveralls but the offer was rejected. After examining the trunk, Cupp searched the interior and seized other articles which appeared to him to be Government property, notwithstanding that the accused represented that at least one of these articles belonged to a friend. Under the circumstances, we cannot fairly conclude, as the board of review concluded, that Cupp did no more than look at what was open and visible for him to see. Cf. United States v Kazmierczak, supra; United States v Burnside, 15 USCMA 326, 35 CMR 298. In our opinion, despite Cupp's contention that he "just went down [to the car] to assist" the accused, he, in fact, searched the accused's car without the accused's consent and without proper authority. It is, therefore, apparent that the deputy base commander's authorization to search was predicated upon illegally obtained information. The law officer should have excluded all evidence obtained in the search made pursuant to this authorization.

As acknowledged by appellate defense counsel, only two of the offenses found are affected by the error in the admission of the evidence. Only these offenses and the sentence, therefore, need to be set aside. Accordingly, the decision of the board of review as to specifications 1 and 3 of the Charge and the sentence is reversed. The record of trial is returned to the Judge Advocate General of the Air Force for resubmission to the board of review. In its discretion, the board of review may direct a rehearing as to specifications 1 and 3 of the Charge and the sentence or dismiss those specifications and reassess the sentence upon the basis of the remaining findings of guilty.

Judge FERGUSON concurs.

Judge DARDEN did not participate in the decision in this case.