# UNITED STATES, Appellee

v

# RICHARD E. WOODS, Specialist Four, U. S. Army, Appellant

No. 26,598

June 22, 1973

*Captain John Howard Shows* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick, Captain Michael A. Mason,* and *Captain Howard M. Schmeltzer.*

*Captain John T. Steger* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Major Thomas P. Burns, III, Captain Richard L. Menson,* and *Captain Glenn R. Bonard.*

## OPINION OF THE COURT

QUINN, Judge:

A general court-martial convened in Wurzburg, Germany, convicted the accused of wrongful possession of opium. The accused contends the conviction is invalid because evidence used against him was obtained in a search that was illegal in that the authorization for it was based on a statement obtained from him in violation of his right, under Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831, to be informed that he could remain silent. See United States v McCrary, 18 USCMA 104, 39 CMR 104 (1969).

Sergeant Akins was Charge of Quarters [hereafter referred to as CQ] of his company on the night of May 17, 1971. The company was quartered in a multi-story building in Schweinfurt, Germany, and the place of duty of the CQ was at a desk in a corridor on the third floor. Previously, Akins had served in Vietnam, where he had seen and used such prohibited substances as marihuana and hashish. He had also "quite often" seen opium, but some of his "good friends" had been killed as a result of using "the stuff," and he "just hate[d] to see anybody use" it. He believed that "pushers" of opium and other "hard drugs" should be "turned in." As a result, when Akins was called about 9:30 p.m. to perform a service at room 34 and saw a "black substance," which he recognized as opium, and articles, such as a spoon, a candle, and rubber tubing, which were

the "makings" for opium use, he asked where the opium had been obtained. One of the occupants of the room told him that "they got it from Woods." Akins had "suspected" for some time that the accused was selling "stuff," and he was "waiting for a chance" to catch him. He "decided that if he could get some" from the accused, he would "turn him in." Accordingly, he went to the accused's room "to get evidence." The accused was not there, but Akins was informed that he was in room 64, which was on the second floor of the building and was occupied by persons attached to, but not members of, the company. Akins proceeded to that room. In response to his knock, an unidentified person opened the door. Akins asked for the accused, and was told that he was present, but apparently Akins was not invited into the room. The accused then "came to the door," and Akins asked him "if he had anything to smoke." The accused answered that he "had some," but he would provide it later because he "didn't have it with him." Akins returned to the CQ's desk on the third floor. It was then about 10:30 or 11:00 p.m.

About an hour or an hour and a half later, the accused appeared in the corridor of the third floor. He "motioned" to Akins to "follow him" to his room. Akins complied. As he entered the accused's room, the accused was at his bunk. Two other persons were in the room, but they were in bed and appeared to be asleep. The accused removed from his pocket a piece of plastic "with the black substance" on it and proceeded to scrape some of the substance onto a piece of cellophane. When he had transferred an amount that he estimated to be "about two grams," he gave it to Akins and told him that it would be $5.00 a gram. Akins agreed to the price, but indicated that he did not have the money but would pay on payday. The accused was agreeable and Akins left with the substance. The next morning when Captain Taylor, the company commander, arrived, Akins informed him of the events related above and gave him the substance he had obtained from the accused.

Although Captain Taylor did not regard Akins as an "outstanding" soldier, he considered that he was doing an "okay-type job." He had known Akins for "quite a while" and, in his opinion, Akins had "never been anything but" trustworthy and believable. Captain Taylor had previously seen "dope" at "various . . . times," and it appeared to him that the substance he received from Akins was dope. He took it to Agent Trustee, chief of the Narcotics Investigation Bureau of the Criminal Investigations Detachment. Agent Trustee examined the substance and concluded that it was opium. At his request, Taylor called Akins to the office to make a written statement about the events of the preceding night. When Akins completed the statement, Captain Taylor read it and found it "to be pretty much what" Akins had personally told him. Later, accompanied by his first sergeant, Agent Trustee, and another agent, Taylor went to the accused's room. There, in a pair of boots belonging to the accused, they found pieces of wax paper covered with the "same black substance" that had been received from Akins. It was stipulated that this substance was opium.

At trial, defense counsel objected to the admission in evidence of the opium found in the accused's boots. He contended that Captain Taylor's authorization to search was predicated upon the accused's previous statement to Akins, which, he maintained, had been obtained in violation of Article 31 of the Uniform Code. The objection was overruled. The validity of the ruling is the subject of this appeal.

In material part, Article 31 requires that before "a person suspected of an offense" is asked to answer any question regarding the offense, he must first be informed that he does not have to make any statement. As the article is operative even when the suspect is not in custody or otherwise significantly deprived of his freedom of movement, it is broader than the right to preliminary advice which was delineated, as part of the constitutional right to remain silent, by the United States Supreme Court in the landmark case of Miranda v Arizona, 384 US 436 (1966). However, the article does not require threshold advice in all instances where one member of the armed forces questions another about a crime which he suspects or

knows the other has committed. In a situation of the kind present here, "the ultimate inquiry . . . is whether the individual, in line of duty, is acting on behalf of the service or is motivated solely by personal considerations when he seeks to question one whom he suspects of an offense." United States v Beck, 15 USCMA 333, 338, 35 CMR 305, 310 (1965). *Cf.* United States v Hinkson, 17 USCMA 126, 37 CMR 390 (1967).

Government counsel contend that Sergeant Akins was prompted solely by his own intense dislike of hard drug pushers. At several points in his testimony, Akins did indeed maintain that he did what he did in regard to the accused for "a personal reason [more] than anything else." Elsewhere in his testimony, however, Akins admitted that he acted also in discharge of his duties as CQ. Asked specifically why he believed "it was his duty" to get evidence against the accused, he replied: "Because I was acting as CQ, Charge of Quarters, and my own personal reasons to do it." Akins, therefore, was no mere volunteer to law enforcement in his transactions with the accused, but was directly engaged in performance of the responsibilities of a command CQ during a regular tour of duty, which made him, as Captain Taylor testified, the commander's "representative." In the capacity in which he was serving, Akins could not question the accused about a suspected offense, without first informing him of his right to remain silent under Article 31. United States v Thomas, 16 USCMA 306, 36 CMR 462 (1966). Consequently, defense counsel's objection was improperly overruled.

The decision of the Court of Military Review is reversed. Since it does not appear that there is any available substitute for the inadmissible evidence, a rehearing would be inappropriate. See United States v Pedersen, 2 USCMA 263, 266, 8 CMR 63, 66 (1953). Accordingly, the findings of guilty and the sentence are set aside, and the charge is ordered dismissed.

Chief Judge DARDEN and Judge DUNCAN concur.