UNITED STATES, Appellee

v

RAYMOND C. CARLISLE, Specialist Four, U. S. Army, Appellant

No. 26,912

December 28, 1973

*Captain Thomas Barry Kingham* argued the cause for Appellant, Accused. With him on the brief was *Colonel Arnold I. Melnick.*

*Captain R. Craig Lawrence* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Major Thomas P. Burns, III, Captain Richard L. Menson,* and *Captain Raymond Michael Ripple.*

## OPINION OF THE COURT

QUINN, Judge:

Two issues are presented by this appeal from a conviction for possession of lysergic acid diethylamide (LSD) by a military judge sitting as a general court-martial without court members. The first question concerns the legality of a search of the accused's person, and the second deals with the admissibility of oral pretrial statements made by him.

PFC Cheatham, a self-confessed seller and user of prohibited substances, reported to Lieutenant Colonel Wurman, the accused's battalion commander, that the accused had prohibited drugs in his possession. It is undisputed that, as reported, Cheatham's information justified Colonel Wurman's authorization to search the accused, and that the ensuing search resulted in the discovery of LSD tablets in the pocket of the accused's fatigue jacket. At trial, Cheatham was called as a defense witness to support a defense objection to the admission in evidence of the LSD tablets. He testified that his report to Colonel Wurman was false in that he had "planted" the LSD tablets on the accused in order to get the accused "busted," and thereby advance his own separation from the service.

To counter Cheatham's testimony, trial counsel called Sergeant Godwin as a witness. Godwin testified that, before trial, he had had two conversations with the accused in which the accused represented that he had brought LSD into the battery area and had given some to Cheatham; Cheatham then "ratted on him" and he was "busted." At the end of Godwin's testimony, the trial judge observed that "None of this goes to probable cause." Trial counsel agreed. Defense counsel made no immediate comment, but submitted a memorandum of law, which made no mention of Cheatham's testimony. In a later colloquy between

him and the judge, the judge remarked: "The issue is not how credible the informer is now . . . [but] how credible he was at the time the search was authorized." The judge found that the search "was based upon probable cause," and admitted the LSD tablets in evidence. The trial proceeded on the merits, with the defense case consisting largely of evidence of accused's good reputation and excellence of performance of duty.

Final arguments by counsel developed a conflict as to the content of Godwin's testimony. The judge recalled Godwin for further examination, and when Godwin completed his testimony, he advised defense counsel that he had "the right to reopen . . . any area" of the case. Counsel declined to exercise the right. Before announcing his formal findings on the merits, the trial judge made the following statement:

I am satisfied from the evidence that Specialist Carlisle had the LSD in his possession on the 28th of May. I am also satisfied that Cheatham did not plant the LSD on Carlisle and that Cheatham lied when he was on the witness stand about how the accused, Specialist Carlisle, got the LSD. I am satisfied that Carlisle is guilty of the offense of possession of LSD beyond a reasonable doubt.

██ ██ Appellate defense counsel contend that the accused has a right to challenge the validity of the authorization to search on the ground that the information furnished the issuing officer was known to be false, and that the trial judge erred by refusing "to consider Cheatham's testimony both with respect to probable cause and on the merits." We perceive no refusal by the judge to consider Cheatham's testimony on the question of probable cause. His comment that "None of this goes to probable cause" appears to us to refer to God-

win's, not Cheatham's testimony. Godwin's testimony dealt only with pretrial admissions by the accused, and these were not part of the information upon which Colonel Wurman authorized the search. The judge also commented on Cheatham's testimony, but his comments were to the effect that, while it raised a question as to whether the accused was "in possession knowingly," it did not affect the sufficiency of the facts justifying the search that were before Colonel Wurman. His conclusion on that point was, in our opinion, correct. Even if the pills were "planted," they were seizable as contraband. Criminal responsibility for possession of contraband may depend upon the circumstances of possession, but such circumstances do not affect the Government's right to confiscate the contraband.

Moreover, that the judge actually considered Cheatham's testimony on the question of probable cause appears in his comments as to the implications of Godwin's recall testimony. He observed that the latter concerned not only the merits, but raised the "other question" of the "reliability of" Cheatham as "an informant." In the context of these remarks, his statement to defense counsel that he had the right to reopen "any area" of the case clearly contemplated the opportunity to reargue the admissibility of the LSD tablets on the basis of Cheatham's testimony. In view of defense counsel's refusal to exercise the right, it would have been merely an empty gesture for the trial judge to vacate, on his own initiative, his previous ruling, only to overrule again the defense objection because he believed that Cheatham "lied from the witness stand."

Determination of the credibility of a witness is the special responsibility of the trial forum. The judge remarked that "viewing of the witnesses" was an important part of the process and regretted there was "no way that this record can show how those witnesses looked and how they acted during their testimony." We are not prepared to say that his disbelief of Cheatham is not supported by the record. We conclude, therefore, that there is no merit in the present attack on the judge's ruling admitting in evidence the LSD tablets found on the accused.

Godwin's conversations with the accused provide the basis for appellate defense counsel's second assignment of error. Godwin acted as prison escort for the accused on two occasions during accused's pretrial confinement. On the first occasion, Godwin escorted the accused to the office of the brigade and battalion commander and then to the messhall. While they were together, he asked the accused "what he was in for" and the accused replied, "a drugs rap." "Out of curiosity," Godwin asked the accused what happened, and the accused answered that he had "tried to do a buddy a favor." "In order to keep him [the accused] going," so that he could "get on to what had taken place," Godwin continued to "drop a word here and there." The accused told Godwin he had given some LSD to his buddy who later "turned him in" and Captain O'Lear "busted him." However, the accused thought "they" didn't "really have anything to go on" because the man who turned him in was now out of the service on a "212." At the messhall, Godwin and the accused were joined by an unidentified person and a Ricky Johnson, a one-time roommate of Cheatham. Obviously unconcerned about Godwin's presence, the accused asked Johnson if he could "fix him up with some stuff." Johnson doubted that he could get it into the stockade, but the accused assured him that was "no problem," he would put Johnson on his "visitors list and there would be no sweat."

About two weeks later, Godwin again served as prison escort for the accused. This time, they went to the court-martial of another soldier. As they sat in an anteroom of the courtroom, Cheatham entered; when the accused saw Cheatham, he became "very excited." Godwin quieted him, and asked whether "that [was] the man." At different points in his testimony, Godwin gave different versions of the accused's answer. In one, he said the accused replied: "That's the man;" in the other, the purported answer was: "Yes, that's Cheatham."

Godwin admitted that he always "asked questions" of the accused and that he did not at any time advise the

accused of his right to remain silent under Article 31. He gave as his reason for not mentioning the right to remain silent that he had "no intentions of turning against the man." The following excerpt from his cross-examination also bears on the issue:

Q. Did you think you had to give him warnings?

A. No, sir. At that point I had no intentions of turning against the man.

Q. And who prompted you to?

A. No one prompted me, sir. As a matter of fact, the only thing that prompted me was probably I felt that it was my duty. I had done a little bit of checking around, talking with Captain O'Lear about the case itself and, at that point when I related the story to him, I told him that if it was necessary that my testimony was needed, then I would be more than happy—

Q. You were checking around on your own?

A. Yes, sir. Checking around to try to find out just what the story was.

Q. When you found the story, you revealed it to Captain O'Lear?

A. I told Captain O'Lear.

When Godwin completed his recall testimony, the trial judge noted that it posed a question as to a "requirement of a warning." Trial counsel argued no warning was required because there were "merely conversations between people." Defense counsel objected to Godwin's testimony on the ground that accused's statements were obtained in violation of Article 31. The objection was never specifically passed upon by the trial judge. Instead, he made certain findings with respect to Cheatham's credibility and the merits and entered formal findings of guilty.

On review, the Court of Military Review pointed out that whether Godwin was required to advise the accused under Article 31 depended upon whether he was acting "officially." The court construed Godwin's testimony to indicate that he was "not prompted to relate what he heard . . . to any officials until he began to feel it was his duty to do so *after the conversations in question.* United States v Carlisle, 46 CMR 1250, 1254 (ACMR 1973). (Emphasis added.) The court concluded that the trial judge "correctly resolved" the question of officiality, and properly admitted Godwin's testimony.

Appellate defense counsel disagree with the Court of Military Review's interpretation of Godwin's testimony. They construe it to mean that a sense of duty induced Godwin not merely to report after the conversations that he had talked to the accused but to question the accused during those conversations. In the language of United States v Beck, 15 USCMA 333, 338, 35 CMR 305, 310 (1965), they assert that Godwin was not "motivated *solely* by personal considerations" when he questioned the accused. (Emphasis added). See also United States v McCrary, 18 USCMA 104, 39 CMR 104 (1969). As a result, Godwin was, in their view, required to inform the accused of his right to remain silent; as he did not, the accused's statements were inadmissible against him.

Government counsel argue that Godwin's testimony reflects two separate motivations. One induced his conversations with the accused; the other brought about his report of the conversations to Captain O'Lear. With the Court of Military Review, they conclude that "curiosity" alone led to the conversations, and the sense of duty precipitated the report to Captain O'Lear. They, too, refer to United States v Beck, supra, but they stress *Beck's* holding that the facts determine whether a conversation with an accused is official or personal. They urge acceptance of the findings of fact by the trial judge and the Court of Military Review because the facts are supported by ample evidence.

■ Godwin's testimony can reasonably be construed to indicate that his purpose in speaking with the accused was wholly personal. The indication is apparent in Godwin's reply to Captain O'Lear's question as to why he was concerned about the accused's case. His answer was: "Well, idle curiosity more than anything." In our opinion, appellate defense counsel misconstrue the meaning of Godwin's reference to "prompting" which appears in the above excerpt from his testimony. Fairly construed, defense counsel's question, "And who prompted

you to" refers back to Godwin's answer to the preceding question, in which he said that "at that point I had no intentions of turning against the man." Thus, the question was what prompted Godwin, thereafter, to turn against the accused. Godwin's response explains the reason for the change in his intentions, not the reason for engaging in conversation with the accused. In other words, Godwin turned against the accused some time after his conversations with him because after those conversations he did "a little bit of checking around" and discovered information which led him to conclude "that it was his duty" to disclose the conversations.

The accused's attitude toward Godwin, as reflected in the conversation at the messhall between the accused and Rickey Johnson in Godwin's hearing, also emphasizes a personal relationship between him and Godwin. It is evident from the accused's request to Johnson to bring him drugs in the stockade, that the accused had no fear of, or reservations about, talking of his involvement with drugs in Godwin's presence. Obviously he did not consider Godwin as a police officer or as representing "authority."

On the basis of the evidence in the record, therefore, the trial judge and the Court of Military Review, as factfinders, could fairly determine that the conversations between Godwin and the accused were not official, but solely personal. Consequently, no preliminary warning as to the right to remain silent was required. See United States v Dandaneau, 5 USCMA 462, 18 CMR 86 (1955).

The decision of the Court of Military Review is affirmed.

Chief Judge DARDEN concurs.

DUNCAN, Judge (concurring):

I do not believe that the exclusionary rule is the appropriate legal mechanism to resolve the dilemma created by an informant who testifies at trial that before he advised the commander that the accused was in the possession of LSD he had planted the drugs on the accused without the accused's knowledge. This is evidence which goes directly to the element of the charge of wrongful possession of LSD that the possession of drugs is with the knowledge of the accused person. In this case, the military judge, as factfinder, addressed himself to this issue by expressing his belief that the informant "lied when he was on the witness stand about how the accused, Specialist Carlisle, got the LSD." The military judge went on to state, "I am satisfied that Carlisle is guilty of the offense of possession of LSD beyond a reasonable doubt." This adjudication of guilt by a valid trial forum should be disturbed only for the most weighty of reasons.

To resolve this case differently by reopening the question of the validity of the search and seizure which uncovered the crucial physical evidence of the LSD found on the accused's person would require us to determine now in his favor an essentially factual issue which went against the accused at trial. Although it would indeed be a travesty of justice for a person to be convicted of wrongfully possessing drugs which had been planted on him unknowingly, an appellate court is ill equipped to make such a determination. Surely, it is not legally required to set aside every conviction automatically where an informant subsequently "confesses" that he set up a phony case against an accused. Such a rule would wreak havoc with a criminal justice system already deeply dependent on informants by exposing them to the inevitable pressure to recant their stories for a price or under threat once an accused they have informed upon is brought to trial.

The exclusionary rule should be invoked to invalidate a search only when there has been governmental misconduct or unreasonableness capable of deterrence associated with it.[1] There is no indication in this record that the commander who authorized the search in question was aware that the LSD had been planted on the accused. And, although the informant's reliability was highly questionable, his reliability was

---

[1] See Theodor v Superior Court of Orange County, 501 P2d 234, 249 (Cal, 1972).

assessed favorably in the appropriate forum, first by the officer authorizing the search, and then in the trial forum when the issue of probable cause for authorizing the search was extensively reviewed and decided adversely to the accused. The factual determinations incident to the authorization to search, and the military judge's ruling on the admissibility of evidence seized in the search, are not demonstrably erroneous or improper, and no governmental misconduct or unreasonableness associated with the search procedures warrants the exclusion of the evidence found therein. With these additional thoughts, I concur in affirming the search and the admission of its fruits in evidence.

I also concur with the opinion that warnings under Article 31, Uniform Code of Military Justice, 10 USC § 831, were not required in the conversations between Sergeant Godwin and the accused.